/5

United States District Court
Southern District of Texas
FILED

JAN 1 5 2003

Michael N. Milby
Clerk of Court

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

LAURA ESTELLA SALAZAR-REGINO,  )
                               )
v.                             )      C.A.  B-02-045
                               )
E.M. TROMINSKI, et al.         )
_____)

**FURTHER POINTS AND AUTHORITIES IN SUPPORT OF PETITIONER'S
RETROACTIVITY AND SUBSTANTIVE DUE PROCESS CLAIMS**

Petitioner, by the undersigned, and in anticipation of the upcoming oral argument on the issues presented in this, and in the series of related cases, would respectfully present to the Court for its consideration a law review article authored by Prof. Nancy Morawetz, "Rethinking Retroactive Deportation Laws and the Due Process Clause," 73 N.Y.U.L. Rev. 97 (1998). Although said article was written during, and with an eye to, the controversy surrounding the Attorney General's decision to apply retroactively §440(d) of AEDPA, [1] it is of continued vitality for its thorough discussion of the issue of retroactivity and Substantive Due Process.

The distinction between the retroactive application of new legislation, (as with AEDPA §440(d), and *St. Cyr*), and the retroactive application of a new *interpretation* of a legislative provision, (the issue presented herein), largely evaporates when one considers that while deportation is not "punishment," it is a "penalty," and a long line of Supreme Court cases requires "fair notice" of the scope even of civil penalties for misconduct. *See, e.g., BMW of North America v. Gore,* 517 U.S. 559,574 (1996).

Respectfully Submitted,

_____

[1]  This controversy generated approximately fifty petitions for habeas corpus in this Court, and was ultimately resolved in favor of the immigrants in *INS v. St. Cyr,* 121 S.Ct. 2271 (2001).



Lisa S. Brodyaga, Attorney
REFUGIO DEL RIO GRANDE
17891 Landrum Park Road
San Benito, Texas 78586
(956) 421-3226
Fed. ID.  1178
Texas Bar 03052800


### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing, and accompanying
article were personally served on the office of Lisa Putnam, SAUSA,
1709 Zoy St., Harlingen, Texas, on January 13, 2003.

2

Copyright (c) 1998 New York University Law Review
New York University Law Review

April, 1998

73 N.Y.U.L. Rev. 97

LENGTH: 40587 words

ARTICLE: RETHINKING RETROACTIVE DEPORTATION LAWS AND THE DUE PROCESS CLAUSE

Nancy Morawetz *

    * © 1998 by Nancy Morawetz, Professor of Clinical Law, New York University. A.B., 1976, Princeton University; J.D., 1981, New York University. I gratefully acknowledge the thoughtful comments of Anthony G. Amsterdam, Lenni Benson, Matthew Diller, Christopher Eisgruber, Paula Galowitz, Gerald Neuman, Manny Vargas, and Carlos Vasquez; the excellent research assistance of Joanna Reisman; the fine editing work of Robert Jones and the New York University Law Review staff; the efficient administrative and secretarial support of Susan Hodges; and the financial assistance of the Filomen D'Agostino and Max E. Greenberg Research Fund of New York University School of Law.  I assisted The Legal Aid Society in Mojica v. Reno, 970 F. Supp. 130 (E.D.N.Y. 1997), Yesil v. Reno, 973 F. Supp. 372 (S.D.N.Y. 1997), and Henderson v. INS, No. 97-4050, petition for review filed (2d Cir. Apr. 1, 1997). The views expressed in this Article are my own.

[*97]

In 1996 Congress passed two laws, the Antiterrorism and Effective Death Penalty Act of 1996 and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, which substantially increased the likelihood that permanent residents will be deported from the United States for criminal convictions. The deportation provisions of these 1996 laws are now being applied retroactively to immigrants who could not or would not have been deported under the law in place at the time the immigrants were convicted for their offenses. Noting the potential injustice of this change in the rules by which immigrants were expected to conduct their lives, Professor Morawetz explores the constitutionality of the retroactive application of these new deportation schemes. Rather than relying upon a traditional ex post facto analysis, however, Professor Morawetz examines how the retroactive application of these laws may offend the Due Process Clause, as it has been interpreted and applied in a body of Supreme Court case law addressing economic legislation. The plenary power doctrine alone, Professor Morawetz argues, does not bar the courts from testing the retroactive application of these deportation provisions according to the substantive due process standard enunciated by the Court. In fact, courts may be forced to address the constitutionality of the deportation provisions due to jurisdictional restrictions contained in the 1996 laws. After analyzing the history and text of the 1996 legislation, Professor Morawetz concludes that it would be unconstitutional to apply retroactively many, if not all, of these deportation provisions to immigrants whose conduct and convictions occurred prior to the implementation of Congress's new scheme.


Introduction

On May 24, 1954, one week after its landmark decision in Brown v. Board of Education,    n1 the Supreme Court issued a decision in Galvan v. Press,    n2 reaffirming a line of cases holding that the Ex Post **[*98]** Facto Clause    n3 does not apply to the deportation of lawful permanent residents. Writing for the Court, Justice Frankfurter noted the injustice of the Court's ruling. Deportation, he observed, may "deprive a man 'of all that makes life worth living,'"    n4 and "'is a drastic measure and at times the equivalent of banishment or exile.'"    n5 He added that, "since the intrinsic consequences of deportation are so close to punishment for crime, it might fairly be said also that the Ex Post Facto Clause, even though only applicable to punitive legislation, should be applied to deportation."    n6 Nonetheless, he concluded, the power of Congress to regulate aliens was supported by "not merely 'a page of history,' but a whole volume."    n7 The Court was not about to disturb precedent under which laws could be applied ex post facto to the conduct of permanent residents, despite the fact that such laws resulted in the banishment of these residents from the country in which they had made their homes.

Perhaps it is too much to expect that, in a Term in which it overturned Plessy v. Ferguson,    n8 the Court would have been prepared to take on a second line of ingrained precedent. But, on examination, the task before the Court in the two cases was remarkably similar. In both cases, the Court faced precedent rooted in the most racist decisions of the Court.    n9 In both cases, the Court faced precedent that had come to stand for propositions that were far broader

2

than the facts of the earlier decisions required.    n10 In both cases, the precedent raised questions about how a disempowered group would be treated by the **[*99]** majority.    n11 And in both cases, the task of examining that precedent required the Court to look beneath categorical labels and to examine the roots of the doctrine and its proper meaning in the new situations brought before the Court. But perhaps having struggled to form Brown's unanimous opinion, the Court blinked at the task of rethinking its proper role in examining policies that require the deportation of long term permanent residents.

The permissibility of retroactive laws requiring the deportation of long term permanent residents is once again before the courts. In two laws passed in 1996 - the Antiterrorism and Effective Death Penalty Act of 1996    n12 (AEDPA) and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 n13 (IIRIRA) - Congress vastly expanded the circumstances under which lawful permanent residents are deportable as well as the circumstances under which they will be barred from relief from deportation.    n14 These laws are now being applied retroactively to require the deportation of immigrants who were charged and convicted of crimes that, at the time they were charged and convicted, would not have required their deportation.    n15 **[*100]**

Constitutional scrutiny of these retroactive deportation laws can be expected for several reasons. First, the new laws are accompanied by restrictions on judicial jurisdiction that could require the courts to reach constitutional issues in cases that might previously have been resolved through statutory interpretation.    n16 Under the Justice Department's interpretation of the jurisdictional provisions of AEDPA and IIRIRA, the courts can only review certain classes of deportation decisions if they raise a "substantial constitutional question."    n17 If the courts accept this view of the limitations on their jurisdiction, they will have no choice but to consider the constitutional issues raised in these cases.    n18 This is significant because, as a matter of statutory interpretation, the Court has long required retroactive deportation provisions to be supported by clear congressional mandates.    n19 Correspondingly, Congress typically has been clear when it has made deportation stat-    **[*101]** utes retroactive.    n20 If the courts are barred from considering such statutory arguments, they will have to consider whether to uphold the constitutionality of deportations of long term residents for past convictions even when such deportations are not supported by a clear statement from Congress that it intended such a result.    n21

Second, the very fact that courts may be barred from directly considering issues of statutory interpretation changes the nature of the constitutional issues at stake and increases the likelihood that courts will take these challenges seriously. Courts will face the question of constitutional limits on retroactive deportation laws when it is not even clear that Congress ever intended that its laws be applied retroactively.

Finally, even where Congress has clearly provided for retroactive deportation, making the potential bar to statutory claims less important, the breadth of the new laws tests the limits of how far Congress can go in deporting people for past convictions. The new laws pose the question whether courts should sit by idly regardless of how long ago a crime was committed, how minor the crime, how plainly the person has shown rehabilitation, how serious the

3

consequences of deportation, or how tenuous the justification for deportation. They raise issues reminiscent of Justice Douglas's query in his dissenting opinion in Marcello v. Bonds,    n22 a case decided soon after Galvan, in which he asked whether Congress could pass a law that required the deporta-    [*102] tion of immigrants who had violated the traffic laws at some time in their past. n23

When courts have addressed the constitutional dimensions of retroactive deportation policies, they have traditionally looked to the Ex Post Facto Clause. In arguments that have been well presented in the dissenting opinions of the Court, Justices have questioned the very premise by which retroactive deportation statutes are shielded from scrutiny under the Ex Post Facto Clause. n24 They have argued that it is simply wrong to classify deportation as something other than punishment. This view was echoed recently in a concurrence by Judge Sarokin of the Third Circuit in a case challenging the retroactive application of a 1990 law.    n25 Judge Sarokin called on the Supreme Court to revisit the question whether the Ex Post Facto Clause applies to deportation statutes, writing:

The legal fiction that deportation following a criminal conviction is not punishment is difficult to reconcile with reality, especially in the context of this case. Mr. Scheidemann entered this country at age twelve; he has lived here for thirty-six years; he has been married to an American citizen for twenty-four years; he has raised three children all of whom are American citizens; his elderly parents are naturalized American citizens; two of his four siblings are naturalized American citizens, and all four of them reside permanently in the United States; he has no ties to Colombia, the country to which he is to be deported; and he has fully served the sentence imposed on him. If deportation under such circumstances is not punishment, it is difficult to envision what is.

    ....

    ...I suggest that now is the time to wipe the slate clean and admit to the long evident reality that deportation is punishment.    n26

Although much can be said for Judge Sarokin's call to revisit the applicability of the Ex Post Facto Clause,    n27 this Article takes on a more modest task. Standing alongside ex post facto jurisprudence is an established line of precedent that requires acceptable governmen-    [*103]    tal justifications for retroactive legislation.    n28 This case law, which has developed under the Due Process Clause, is narrower than ex post facto jurisprudence. It does not bar retroactive laws. But what it does do is require that the retroactive aspects of any statute be supported by independent and sufficient justification.

In a recent decision, Mojica v. Reno,    n29 Judge Jack B. Weinstein found that retroactive application of AEDPA's deportation provisions lacks the type of independent justification required by the substantive due process case law. n30 At issue in Mojica was the deportation of two    [*104]    long term permanent residents, Guillermo Mojica and Saul Navas. Mojica pled guilty to a single drug charge eight years prior to being placed in deportation proceedings.    n31 At the time he entered his plea, he placed himself at risk of deportation. However, under the law as it stood, he could seek relief in any deportation proceeding by

4

showing equities that counseled against deportation, such as that he was rehabilitated, had a good work record, and had important family ties. Mojica served his sentence and reestablished his life with his family and his business. He was not convicted of any subsequent crimes, and for eight years the INS did not institute deportation proceedings.    n32 After AEDPA was passed, the INS initiated deportation proceedings against Mojica. The government took the position that since AEDPA was retroactive, Mojica now must be deported regardless of the equities of his case.    n33

Navas was admitted to the United States as a permanent resident at the age of twelve. Seven years later, he was arrested on charges of driving a stolen vehicle and purse snatching. Navas pled guilty to both charges. Like Mojica, he pled guilty at a time when the charge to which he pled did not require that he be deported. Because Navas was seen as a fit candidate for rehabilitation, he was accepted into a "Shock Incarceration" program.    n34 Navas successfully completed the program. Meanwhile, the government began deportation proceedings against Navas. He applied for relief from deportation, which was granted on the basis of the equities in his case. Following the ruling by the Attorney General that AEDPA applies to pre-Act convictions, the Board of Immigration Appeals summarily reversed the immigration judge's decision.    n35

Mojica and Navas brought habeas corpus actions in the Eastern District of New York challenging the retroactive application of AEDPA's bar on discretionary relief from deportation. Rejecting the government's jurisdictional arguments, Judge Weinstein found jurisdiction to hear both the statutory and constitutional claims. Ruling independently on both grounds, Judge Weinstein concluded that AEDPA could not be applied retroactively. In his constitutional discussion, Judge Weinstein applied the substantive due process test that    **[*105]** retroactive aspects of a statute be separately justified    n36 and concluded that retroactive application of AEDPA could not be supported. He noted the disjunction between the statute's prospective and retroactive schemes, and the lack of a reasonable purpose behind the requirement that immigration judges ignore the many equitable factors that would bear on whether an individual permanent resident should be allowed to remain in the country.    n37 Retroactive application, he concluded, not only lacks the distinct rationale required by substantive due process, but "flies in the face of what appears to be Congress's design in enacting the AEDPA."    n38

Mojica presents the easiest case for a substantive due process challenge to a retroactive deportation policy. Under substantive due process analysis, the key question is whether Congress had adequate reasons for making particular provisions retroactive. Since the statutory provision at issue in Mojica is not on its face retroactive - and in fact, the better reading of the statute is that it was not meant to be applied retroactively    n39 - the Mojica court was left to find a rationale for a result that Congress probably never intended. Under these circumstances, there is a serious question whether a court considering a substantive due process challenge should even consider the government's proffered justifications for applying a law retroactively. The issues get more difficult with IIRIRA, in which some of the statutory provisions are explicitly retroactive, but where there remain arguments that there is no separate rationale for applying IIRIRA's new standards of deportation to persons whose convictions were entered under a different statutory deportation scheme. Under

these circumstances, the courts are more likely to face the core question of the type and strength of government rationale required to support retroactive deportation provisions.

This Article looks generally into the theoretical and doctrinal justifications for a substantive due process evaluation of retroactive deportation statutes. Part I provides background on the laws governing deportation of immigrants convicted of crimes and the retroactive changes in those laws under AEDPA and IIRIRA. Part II proceeds to examine the degree to which courts can entertain substantive challenges to deportation statutes. It notes that the controversy over the need for greater judicial review of immigration policies can obscure those routes which are available for reviewing policies under existing doctrine. This Part proceeds to show that there is room in existing **[*106]** doctrine for judicial consideration of substantive due process challenges to the fairness of retroactive laws affecting long term residents. Part III explores the general substantive due process constraints on retroactive statutes as they have developed in modern case law regarding economic legislation. Building on the established principle that the retroactive aspects of a statute require separate justification, this section examines how this body of case law might be applied to retroactive deportation laws. Part IV returns to the provisions of AEDPA and IIRIRA and offers some initial thoughts about how courts should evaluate the constitutionality of retroactive deportation actions taken under the authority of those statutes. I argue that the absence of a clear statement of congressional intent should be sufficient, in itself, to raise serious questions whether there is the requisite independent justification for deportation under the provisions of those statutes. Where congressional intent is clear, I argue that the courts nonetheless have an obligation to evaluate whether there is a reasonable objective, consistent with the immigration and nationality laws, for after-the-fact changes in the immigration consequences of a criminal conviction.

I

Retroactive Deportation Under AEDPA and IIRIRA

The AEDPA and IIRIRA provisions that are the subject of this Article affect the deportation of long term lawful permanent residents. So we may begin with some understanding of who these immigrants are and the communities in which they live. There are currently over ten million lawful permanent residents in the United States.    n40 They have either entered the country legally or have been accepted by the INS as legal residents of the United States. Almost all are eligible to become citizens after five years. Many, however, do not. Their reasons vary and include inertia, sentimental ties to a home country, difficulty or fear of taking the tests for citizenship, the unavailability of citizenship preparation courses, and the fact that permanent residents have traditionally possessed virtually equal status with citizens. For some immigrants, this choice may not be their own. Each year, about twenty percent of lawful permanent residents entering the country are under the age of fifteen.    n41 If the child's parents **[*107]** naturalize before the child turns eighteen, the child automatically becomes a citizen.    n42 But if the parents do not, the child cannot take the initiative of obtaining citizenship until becoming an adult.

6

Permanent residents go to school, marry, raise children, work, and lead lives that are like those of citizens. n43 They are expected to comply with the laws as they exist at the time, including tax laws, regulatory laws, and laws defining crimes.

When a lawful permanent resident faces criminal charges, the formal qualities of the process mirror those encountered by a citizen. n44 The permanent resident has the same procedural protections as a citizen and faces the same system of plea negotiation, trial, and sentencing. A permanent resident cannot be charged with a crime that was not a crime at the time it was committed. The permanent resident cannot receive a sentence that exceeds that authorized at the time the crime was committed.

The permanent resident, however, faces one big difference in the criminal process. Because criminal convictions have long been connected to the potential for deportation, the permanent resident who commits a criminal act or pleads to a conviction for a crime may run the risk of losing his or her status as a permanent resident and being deported from the United States. AEDPA and IIRIRA have increased both the possibility and the likelihood of deportation. In the most extreme cases, convictions that previously would have had no possible deportation consequences now mandate deportation.

A. Changes in the Statutory Scheme
for Deporting Noncitizens Convicted of Crimes

1. Pre-1996 Law

Under the pre-1996 law, an immigrant was subject to deportation if she or he was convicted of any crimes that fell within one of several categories. These included: a single "crime involving moral turpitude," committed within the first five years after entering the country, for which the person was sentenced to a year in prison; n45 any two **[*108]** "crimes involving moral turpitude" n46 committed at any time; n47 any "aggravated felony"; n48 any drug crime other than a first-time offense for possession of less than thirty grams of marijuana; n49 certain firearm **[*109]** offenses; n50 and other miscellaneous crimes. n51 If the INS instituted deportation proceedings and the permanent resident had resided lawfully in the United States for seven years, n52 she or he could apply for a waiver of deportation under section 212(c) of the INA. n53 The time for accruing the necessary seven years of lawful residence continued to accrue during deportation proceedings. n54 **[*110]**

Under section 212(c), the availability of a waiver in any given case depended on the equities of the case. The immigration judge n55 would decide whether to grant the waiver based on such factors as the person's rehabilitation, family ties, and length of residence in the country, as well as the hardship that would be imposed if the resident were required to return to his or her country of origin. n56 Relief was barred only for those permanent residents who had committed crimes classified as "aggravated felonies" and who had served a prison sentence of five years. n57

The award of a waiver depended not only on the nature of the criminal conduct, but also on the immigrant's life after committing the crime. Like a parole board, the immigration judge would look at whether the individual had

7

genuinely rehabilitated. As in the case of an inmate who will face a parole board, the immigrant could conform his or her conduct to the expectations of the reviewing body. But unlike in the parole board context, where reviews take place during the course of a sentence, the waiver of deportation process could also serve as a forum for considering the long term record of those persons against whom deportation proceedings were initiated years after they had committed their crimes and served any criminal sentence.    n58 This    **[*111]**    waiver process protected the interests of the immigrant who may have built a life of work, family, and community based on the understanding that his or her past conviction would not lead to deportation. It also protected the interests of all of those whose lives were intertwined with that of the immigrant, including family members, employers, and the employees of immigrants who operated businesses. In practice, approximately half of the long time permanent residents who sought relief from deportation were granted such relief.    n59

   2. Post-1996 Scheme

   AEDPA and IIRIRA changed the system for deporting immigrants convicted of criminal conduct. Jettisoning old practices, in which many permanent residents convicted of crimes were not placed into proceedings and many others were permitted to post bond so that they could rejoin their families, the new law places a mandatory detainer on all noncitizens convicted of crimes which applies at the time of their release from the custody of the criminal justice system. n60 In cases where the deportation proceedings do not conclude while the person is in prison,    n61 the criminally convicted permanent resident will    **[*112]**    no longer be allowed to apply for a bond.    n62 In most cases, the new law requires that the INS maintain physical custody of the immigrant unless an affirmative determination is made that she or he should not be deported.

   With respect to deportability, these laws increase the number of permanent residents who are deportable and increase the number of those who are ineligible for relief from deportation. Under IIRIRA, two of the hardest hit groups are those now classified as having a conviction for a "crime involving moral turpitude" committed within their first five years following admission    n63 to the country and those treated as aggravated felons.

   Two changes in the law appear to work together to deny relief to permanent residents who are convicted of a "crime involving moral turpitude" during their first five years after admission to the United States.    n64 The first is the abandonment of the requirement that the crime be one for which the person served a year in prison. Under the new statute, any crime that is punishable by a year in prison can lead to deportation, regardless of the actual sentence imposed. n65 In New York, for example, a single petty theft offense that leads to no prison time now falls within the reach of this deportation ground.    n66 Second, IIRIRA provides that the seven-year period of residency which is required in order to apply for relief from deportation stops accruing when the person commits the crime or is placed in deportation proceedings.    n67 By definition, permanent residents who were admitted    **[*113]**    within five years of the conviction will not have the necessary seven years of lawful residency before the clock stops running.    n68

8

The second major change in the law is the treatment of "aggravated felons." IIRIRA and AEDPA have expanded greatly the list of crimes included as "aggravated felonies." n69 For example, a crime of theft for which the person receives a one-year sentence is now an aggravated felony. n70 Previously, a theft crime was only classified as an "aggravated felony" if the individual received a sentence of five or more years. n71 Although such a crime would have been considered a "crime involving moral turpitude," it would not have been grounds for instituting deportation unless it was committed within the first five years or was accompanied by a second crime of moral turpitude.

In addition to this expansion of crimes defined as "aggravated felonies," the new law mandates deportation for all aggravated felons regardless of the time that they have served in prison or whether they are sentenced to any prison sentence at all. Unlike the old law, in which relief was unavailable for those who were required to serve five years in prison, the new law requires deportation for anyone classified as an "aggravated felon." n72 As a result, a theft crime with a one-year **[*114]** sentence now requires deportation, whereas under previous law, it might not even have been a ground for deportation. This elimination of relief arguably applies even if the permanent resident is convicted of a crime treated as a misdemeanor under state law. All that matters is that the crime fits the new federal definition of an "aggravated felony." n73

AEDPA contained somewhat different provisions. Like IIRIRA, AEDPA barred relief for persons who were convicted of aggravated felonies. It also barred relief for persons convicted of drug or firearm offenses and those convicted of any two crimes of moral turpitude. n74 For some immigrants, such as those convicted of a single drug possession crime or two crimes of moral turpitude, the AEDPA restrictions are harsher than those enacted in IIRIRA. For others, IIRIRA's change in the definition of "aggravated felonies" together with its clock-stopping rules for accruing the residency needed for relief from deportation make IIRIRA a more severe scheme. Although AEDPA's restrictions were modified by IIRIRA, they continue to be applied to persons placed in proceedings prior to April 1, 1997. n75 **[*115]**

3. Retroactivity Under AEDPA and IIRIRA

With respect to past convictions, AEDPA and IIRIRA have created a complicated regulatory structure. These laws contain numerous statutory formulations of when and how the laws will apply to past conduct. Some provisions are explicitly limited to convictions after the effective date of the respective legislation. n76 Some provisions are explicitly retroactive regardless of the date of the crime. n77 Some are made effective for persons who were placed in deportation proceedings after the date of the legislation. n78 Some are effective for persons placed in proceedings six months after the passage of the legislation. n79 Some provisions are silent as to their retroactivity. n80

Just as the impact of the prospective scheme depends on the interaction of various provisions of the new law, the implications of retroactivity depend on the interrelationship of the different provisions and whether each of these

9

provisions is treated as retroactive. The potential impact of retroactivity is illustrated by the case of Jesus Collado.

Jesus Collado came to the United States in 1972 at the age of seventeen. While he was a teenager, he had a sexual relationship with a girlfriend who was four years his junior.   n81 Because the girlfriend was a minor, this relationship constituted a crime. The girlfriend's mother pressed criminal charges against Mr. Collado, and he pled guilty to the crime of sexual abuse in the second degree.   n82 Mr. Collado served no prison sentence for this crime. n83 At the time that  **[*116]**  he entered this plea, Mr. Collado's crime did not constitute grounds for his deportation. At that time, a person was only deportable for a single crime of moral turpitude if the person served a sentence of a year in prison. Because Mr. Collado served no time, he was not deportable. The conviction had no relevance to his ability to remain as a permanent resident unless he committed a second crime involving moral turpitude.

Mr. Collado committed no further crimes. Instead, he proceeded to establish his life in this country, marry, raise children, and manage a restaurant.   n84 In 1997, he traveled to the Dominican Republic on a two-week trip. On his return, he was detained and placed in removal proceedings under IIRIRA.   n85 Mr. Collado was subsequently released from detention, but still faces removal proceedings.   n86

Applying IIRIRA retroactively makes Mr. Collado deportable for his sole misdemeanor offense from 1974. Because IIRIRA looks at the potential sentence for the crime rather than the actual sentence, the conviction falls within the ground of deportation for a single crime involving moral turpitude that carries a possible sentence of a year or more and was committed within five years of entry.

Furthermore, retroactive application of two provisions of the new law may bar Mr. Collado from any possibility of relief from deportation. The first is the clock-stopping rule for calculating the necessary period of continuous residence to seek relief from deportation. At the time Mr. Collado committed his crime and up until April 1, 1977, the law recognized every year Mr. Collado continued to live in this country as relevant to his eligibility for relief from deportation. But if the new clock-stopping rule is applied retroactively to his case, the only relevant time period is that which elapsed prior to the commission of the offense. Because his crime occurred within seven years of his admission to the United States, application of the rule in his case prevents him from applying for relief.   n87  **[*117]**

The second problem for Mr. Collado is the new definition of "aggravated felony" and the bar on relief for all aggravated felons, regardless of the time they serve in prison. Under the old law, Mr. Collado was not an "aggravated felon." Indeed, at the time he was convicted, there was no concept of "aggravated felony" in the immigration law. Under the new law, however, a conviction for "sexual abuse of a minor" is deemed an "aggravated felony." In addition, under the pre-1996 law, even a crime that was deemed an aggravated felony allowed for the application of equitable relief from deportation unless the individual served five years in prison. Because Mr. Collado served no prison time, application of the aggravated felony label would not have required his deportation. The new law, however, bars all "aggravated felons" from obtaining

10

any relief from deportation. Applying this definition retroactively requires that Mr. Collado be deported.   n88

Layered on top of these substantive changes for permanent residents currently in deportation proceedings is the interaction of the two laws' effective dates. Whereas IIRIRA supersedes AEDPA in its prospective formulation of rules, AEDPA remains the law for persons placed in deportation proceedings prior to April 1, 1997.   n89 And since the Attorney General has read the AEDPA bars to relief as being fully retroactive,   n90 AEDPA has become the law for all persons who were placed in proceedings prior to April 1, 1997, regardless of when they committed their crime and what standards governed deportability at the time they committed their crimes.   n91

Consider the following hypothetical example. Jackie H. immigrated to the United States as a lawful permanent resident at the age of eighteen. When she was twenty-five, she was arrested for possession of marijuana when police discovered two ounces of marijuana in **[*118]** a car that she was driving. Although she did not know about the marijuana, she was in fact the owner and driver of the car. Seeking to avoid disruption of her work and family life, she pled guilty to a simple possession charge and was sentenced to probation. Although Ms. H. was technically deportable, she fell within the group of cases in which INS, as a matter of practice, did not pursue deportation proceedings. n92 Several years later, she applies for a replacement permanent residency card. The immigration officer picks up the conviction on a computer check and places Ms. H. in deportation proceedings. Had her proceedings been completed before April 24, 1996,   n93 or had they been initiated after April 1, 1997,   n94 she would have been eligible to apply for a waiver of deportation.   n95 This would allow her to present her various equities. But if her proceedings were pending on April 24, 1996, or began between April 24, 1996 and April 1, 1997, she would fall within AEDPA's bar to relief for all persons deportable for a drug offense. Unless the Attorney General opts to terminate and reinitiate proceedings under IIRIRA,   n96 Ms. H. will be deported regardless of how long ago she committed the offense.

B. Retroactivity and the Disruption of Expectations

Retroactive application of AEDPA and IIRIRA disrupts expectations at three levels. It alters (1) expectations of the consequences of engaging in the underlying conduct that was the basis of the criminal charge; (2) expectations that shaped conduct and decisions during the criminal proceedings, including any plea agreement; and (3) ex- **[*119]** pectations surrounding the immigrant's return to society after having served any sentence imposed as a result of the conviction.

By imposing deportation for new classes of crimes, retroactivity changes the implications of conduct that, while classified as criminal, was subject to weak criminal sanctions. As a matter of practice, many crimes are not treated harshly by the criminal justice system. Although meeting the definition of a crime, many first time offenses, such as the sale of a single marijuana cigarette, might be treated fairly leniently. But the change in immigration consequences can greatly alter the implications of the underlying conduct. For example, an immigrant who made such a single sale of a marijuana cigarette must now be deported without

11

any opportunity to apply for a waiver.    n97 Although that person could have expected some criminal sanction, the extreme harshness of deportation for such an offense could not have been anticipated under the old law.

Retroactivity further changes the consequences of a range of decisions made in the course of the criminal proceedings. For example, the immigrant charged with the sale of a marijuana cigarette may have been able to plead instead to a possession charge of a larger quantity of marijuana. Under IIRIRA, this difference in plea is the difference between automatic deportation and the ability to seek relief from deportation. But under the law in place when the immigrant was agreeing to the deal, there may have been no reason to prefer one plea to the other. Since the immigrant entered his or her plea prior to IIRIRA's classification of any conviction for the sale of drugs as a crime barring relief from deportation, the immigrant had no way of anticipating the consequences of his or her decision.

As the grounds for deportation extend to misdemeanor offenses, some of which are now classified as "aggravated felonies" which bar any relief from deportation, they also reach into parts of the criminal justice system where it has been routine for lawyers and judges to treat cases relatively casually. In a situation where no one expected the stakes to be high, a case may well have been disposed of in min-  [*120]  utes.    n98 It is only now, after the fact, that the defense lawyers, prosecutors, and judges learn that the dispositions made under such circumstances will be the basis for mandatory deportation.

For some immigrants, the decisions made in their criminal proceedings have been encouraged by the prosecution. Some have cooperated with the prosecution, helping to support major convictions against others, and at times risking their lives to inform on others,    n99 only to discover now that their cooperation will not even be considered in their deportation proceedings. With retroactive application of automatic deportation laws, these immigrants will be deported regardless of any of their conduct following their crime or conviction.

For some immigrants, their decisions to plead may have been made despite their innocence of the charges against them. Many of the charges that now seem ominous, because they now require or raise a significant risk of deportation, may have been perceived in the past as not worth fighting. In New York, for example, the new definition of a crime of moral turpitude will sweep in such crimes as stealing an orange or jumping a turnstile.    n100 Although such crimes are theoretically punishable by a sentence of a year, and thus fit the new definition of crimes of moral turpitude that can lead to deportation, a person charged with such a crime could easily have been offered a plea of a fine or probation. Faced with such an offer, and its implications for ending disruption to the person's life, work, and family, many defendants may have opted to take the plea regardless of their belief in their own innocence. Retroactive application of the new law now makes these permanent residents deportable. Indeed, the interaction of the new law's definition of a crime involving moral turpitude and the new rule that ignores residence in the country following the commission of the crime for purposes of being eligible to apply for relief from deportation, could mean that such a person would now be ineligible even to apply for relief from deportation.    n101  [*121]

12

In addition to disrupting the expectations that underlay the criminal proceeding, retroactive application of the new laws upsets the life-expectations of immigrants who have served their time or otherwise paid their debt to society. Immigrants who have completed their sentences, returned to their communities, built families and businesses, and grown further and further away from their countries of origin are now subject to automatic deportation. They no longer have the choice to build a life in their former country - it has been built here.    n102 Their children may not speak the language of that country; indeed, the immigrants themselves may not speak the language and may feel no connection to the country to which they will be deported.    n103

Although the government has argued that such changes in the consequences of past convictions should not be labeled "retroactive,"    n104 its arguments are unconvincing. From the standpoint of the immigrant at the time the conduct was committed, the changes in potential consequences are significant. With respect to the new definitions of crimes of moral turpitude and aggravated felony, conduct that was not even a basis for deportation has now become grounds for mandatory deportation. With respect to crimes that could have led to deportation in the past but were subject to the possibility of relief, a previous risk has been changed into a virtual certainty. This is analogous to criminal statutes in which a range of possible penalties is changed so that the previous maximum sentence becomes a mandatory sentence. Such a change in the law is well recognized to be retroactive.    n105 In addition, the mandatory deportation scheme means that circumstances post-dating the criminal process will not be consid-    [*122]    ered. For the person who is not put into deportation proceedings until decades after the criminal conduct, the mandatory scheme ignores all of the events and developments of the intervening years. This is analogous to the elimination of "good time" credits for persons serving prison sentences, a situation that is also recognized to involve retroactivity.    n106

Each of these changes, if applied to past convictions, serves to alter the legal consequences of those convictions.    n107 The consequences are altered either by creating a risk of deportation where none existed or by making deportation a necessary consequence of a conviction that before only gave rise to a risk. What remains to be seen is what role the courts can play in reviewing the permissibility of such retroactive laws.

II

Plenary Power and the Availability of Substantive
Judicial Review of Retroactive Deportation Statutes

In Galvan, Justice Frankfurter said that the "extent of the power of Congress" to apply deportation statutes retroactively "is not merely a 'page of history,' but a whole volume."    n108 His opinion echoed that of earlier Supreme Court cases that cast immigration matters as wholly outside the Court's scope of inquiry - in a doctrine commonly referred to as the "plenary power" doctrine. n109 So, before delving into particular doctrinal restrictions on retroactive laws, we first must face the question whether the courts have a role to play in evaluating the legality of such laws in the immigration context.    [*123]

13

This question can be answered at two levels. At a normative and theoretical level, the question is what role the courts should play in this area. On a doctrinal level, the question is whether existing doctrine leaves room for the courts to apply due process scrutiny to retroactive deportation statutes.

The former question has been addressed by numerous commentators over the past two decades. These commentators have roundly criticized the "plenary power" doctrine - understood as shielding immigration statutes from any meaningful judicial review - as out of step with current realities and current understandings of the appropriate role of the courts.    n110

Four themes appear in these critiques of the plenary power doctrine. First, the doctrine is sharply at odds with the recognized rights of permanent residents while they are present in the country. Not only permanent residents, but even aliens with no lawful status, have recognized rights to procedural due process.    n111 Furthermore, permanent residents have well established rights to equal protection of the laws.    n112 How can it be that a permanent resident has a right to establish a laundry business,    n113 but no right to any protection as to the criteria governing deportation? As T. Alexander Aleinikoff has argued, no coherent theory of membership in the community can explain the divergence in this case law.    n114

Second, commentators have argued that the plenary power doctrine finds its roots in outmoded notions of national sovereignty and international law. The early decisions treated immigration policy as part and parcel of foreign affairs. This was perhaps in part because these cases arose with respect to Chinese immigrants in an era of rampant racism and xenophobia    n115 and required consideration of treaties between China and the United States on the rights of immigrants.    [*124]    The cases also reflected ideas of national sovereignty rooted in a nineteenth century view of international law. The focus on national affairs was further heightened in the many Cold War era cases concerning membership in the Communist Party. But as commentators have noted, most issues relating to immigration today have little or nothing to do with foreign affairs. Instead they concern relationships between individual immigrants and the United States government.    n116 Why, they ask, should all immigration cases be treated as falling within the category of "foreign affairs" when the Court has been far more discerning in other areas involving possible political questions?    n117

Indeed, some commentators would turn the issue of international norms around. Rather than seeing international law as supporting the unfettered discretion of a country to deport noncitizens, these commentators invoke current international human rights norms as requiring basic protection of the rights of immigrants.    n118

Third, commentators have noted that the tension created by the plenary power doctrine and the courts' traditional role in checking arbitrary governmental action has led to an unhealthy reliance on surrogates for constitutional decisions. These surrogate lines of doctrine - statutory interpretation and procedural due process - have been under pressure to extend into areas that would be better treated by a straightforward consideration of substantive constitutional law.    n119 As a result, there is a less coherent body of case law and less predictability in the judicial resolution of immigration matters.

14

Fourth, commentators have noted that the plenary power doctrine is rooted in an archaic distinction between rights and privileges. The treatment of a lawful permanent resident as a "guest" enjoying the "hospitality" of a host who can terminate the relationship at any time depends very much on the idea that the status of being a lawful permanent resident is a mere "privilege." With the demise of the right/privilege distinction, commentators ask how a concept of plenary power that is rooted in such notions can continue to stand.   n120

These arguments provide a compelling basis for reexamining the very foundations of the plenary power doctrine. They show that, de-  **[*125]**  spite the longevity of the case law proclaiming that the courts should abstain from reviewing cases involving immigration matters, there is little current logic to the doctrine. Whatever its merits when it was first announced - and much can be said for the failures of the initial cases in this area   n121 - the doctrine cannot be squared with contemporary notions of the role of the courts in checking the arbitrary exercise of governmental power.

But critiques of the plenary power doctrine also have the shortcoming of encouraging the assumption that the "doctrine" must be overruled before the courts can play any meaningful role in reviewing arbitrary governmental action in the immigration context. Although commentators on this subject recognize that the doctrine has had some different meanings in different contexts, the very reliance on a single term to sweep in a range of cases can serve to obscure distinctions between types of immigration cases and strands of doctrine. Particularly as it relates to the deportation of long term permanent residents, the use of a single term glosses over recognized differences between the rules governing entry to the country and those affecting those who have entered legally and resided here for many years.   n122 In  **[*126]**  addition, while the Court has continued to be highly deferential on immigration matters, it has altered its rhetoric in ways that make clear that there is some role to be played by substantive constitutional analysis.   n123 Thus, apart from the horizontal confusion about what the doctrine means for different situations, there is the potential of time confusion as to whether the "doctrine" as it exists today is the same as that announced in cases throughout the last century. The very use of the terminology, "the plenary power doctrine," suggests a uniformity that is belied by more recent cases. In short, while the complete reexamination of the doctrine has much to commend it, it is also worthwhile to take the doctrine apart and ask just what it means in terms of the current doctrinal viability of challenges to arbitrary deportation statutes.  **[*127]**

The history of what has come to be called "the plenary power doctrine" has been chronicled elsewhere.   n124 In brief, the doctrine arose out of litigation in the late nineteenth century over the legality of laws designed to exclude and deport Chinese laborers from the United States. In the case of Chae Chan Ping v. United States   n125 (known as "The Chinese Exclusion Case"), the Court upheld a law that denied reentry to Chinese immigrants who had temporarily left the country. Although the immigrants were long time residents, and had obtained certificates that guaranteed them the right to return at the time they left the country, the Court ruled that Congress had the exclusive power to deny these immigrants the right to return. Congress's power over immigrants, the Court reasoned, was a facet of the nation's sovereignty. Four years later, the Court extended Chae Chan Ping to the deportation context, saying that the power of the

government to deport aliens was as absolute as the power to exclude.    n126 Although early cases regarding the entry of new immigrants read this absolute power as permitting any form of government procedures with respect to deportation,    n127 subsequent cases made clear that noncitizens in deportation proceedings possess the right to some measure of fair process.    n128 Thus emerged a substance/procedure fault line in the Court's rhetoric about immigration matters.    n129

But despite the rhetoric that substantive matters of congressional immigration policy were beyond the purview of the Court, the Court continued to consider and weigh substantive arguments in the area. This can be seen in the line of cases finding the Ex Post Facto Clause inapplicable to retroactive deportation laws. In these cases, the Court did not refrain from considering constitutional claims on the ground that it was powerless to rule on the arguments presented. Instead it concluded that deportation was a civil rather than a criminal matter   [*128]   and that, as such, it fell outside the scope of accepted doctrine concerning the Ex Post Facto Clause.    n130

Similarly, when confronted with laws deporting lawful permanent residents for past membership in the Communist Party, the Court engaged in a detailed analysis of arguments regarding the reasonableness of the legislation. In Harisiades v. Shaughnessy,    n131 the Court first rejected the argument that permanent residents have a "vested right" to their status and therefore should be afforded all of the protections   [*129]   of citizens.    n132 It next considered the question whether it should review deportation statutes for their harshness. Here the Court's opinion includes some wide ranging statements, such as, "Reform in this field must be entrusted to the branches of the Government in control of our international relations and treaty-making powers."    n133 But the Court's analysis showed a careful consideration of the arguments supporting the legislation. For example, the Court described how Congress had received evidence of Communist conspiracies within the United States and that the evidence suggested Soviet control of the American Communist Party.    n134 The Court also cited the decision in Korematsu v. United States    n135 for the proposition that overwhelming national interests can support the expulsion of citizens from their homes, thereby indicating that the policy interests behind the statute could survive even a high level of scrutiny.    n136 Although the Court made clear that members of the Court may not have agreed with Congress on the dangers posed by past members of the Communist Party, the opinion repeatedly refers to the seriousness of the congressional concern with subversive activity that led to the Alien Registration Act.    n137 Several years later, in Galvan v. Press, n138 the Court reaffirmed Harisiades. Once again, its decision contained far ranging statements of judicial deference to Congress.    n139 But the Court also noted that the issues presented were identical to those in Harisiades and that the difference between the two statutes was not "so baseless as to be violative of due process."    n140

The Court's willingness to assume a judicial role in evaluating constitutional claims is further evidenced in two cases reviewing void-for-vagueness challenges to deportation statutes. In the first of these cases, Jordan v. De George,    n141 the Court considered a vagueness challenge to the law authorizing the deportation of lawful permanent residents who had been convicted of two "crimes involving moral turpitude."    n142 The Court began its

analysis by considering whether it should entertain a void-for-vagueness challenge to a deportation stat- [*130] ute. While recognizing the broad power of Congress over immigration, the Court held that the severity of the consequences of deportation warranted application of the doctrine in the context of deportation statutes. n143 The Court proceeded to rule that as to the particular issue presented to the Court - whether the statute was vague as applied to a conviction for fraud - there was no vagueness problem. n144 The second case, Boutilier v. INS, n145 reaffirmed the reviewability of deportation statutes for vagueness challenges. n146

Although the vagueness cases sit at the border of substance and procedure, n147 the Court's treatment of the issue sounds strongly in the substantive interests that underlie substantive due process challenges to retroactive laws. In Jordan, the Court stated that the principal problem with vague laws is that they fail to "warn individuals of the criminal consequences of their conduct." n148 Carrying this logic over to the deportation context, the Court reasoned that deportation is a "penalty" and that deportation statutes must therefore be tested under vagueness standards. n149 Thus, the Court found a right to fair warning of the immigration consequences of conduct in addition to fair warning of the criminal law consequences of the same conduct. On the merits, the Jordan Court concluded that the specific grounds for deportation were not vague; n150 and in Boutilier, it concluded that the immigrant was being deported on grounds that pertained to his status at the time of his entry into the country so that he could not have been prejudiced by a vague deportation statute. n151 But both cases interpret the vagueness doctrine to mean that an immigrant, [*131] once she or he has entered the country, has a right to clear laws regarding the circumstances that could lead to deportation and that the Court has the power to enforce that right through the vagueness doctrine.

The Court has confirmed in more recent case law that it is reserving to itself a role in overseeing the constitutionality of immigration statutes. In Fiallo v. Bell, n152 for example, the Court considered a challenge to the system for determining which children may immigrate to the United States. The government argued that the Court should not even hear the case because immigration policy was solely in Congress's domain. The Court rejected this argument, stating that courts have a "limited judicial responsibility" to review substantive aspects of the laws regarding immigration. n153

Thus, despite the rhetoric of absolute congressional power over immigration matters, there is doctrinal room for consideration of specific challenges to laws governing deportation. We now turn to the specific constitutional doctrines governing retroactive statutes and consider how they might be applied in the deportation context.

III


Substantive Due Process Constraints
on Retroactive Deportation Statutes


Once we escape the assumption that courts are powerless to address the constitutionality of retroactive deportation laws, the issue becomes: under what circumstances may the courts appropriately act to invalidate such laws? This

17

section looks for answers to that question through the lens of modern substantive due process doctrine. The section begins by exploring the Court's reasoning in cases scrutinizing retroactive economic legislation under the Due Process Clause. It proceeds to propose that the Court's distinctions between constitu-   **[*132]**   tionally permissible and impermissible rationales for retroactive legislation are rooted in several troubling aspects of retroactive legislation that have been best articulated in the Court's statutory retroactivity cases. This section then explores the infrequency with which the Court has actually struck down retroactive economic legislation and suggests that the conditions under which such legislation is passed - as contrasted with the retroactive deportation statutes - make it far more likely that courts will be required to consider the constitutionality of retroactive deportation statutes and that the statutes will be, in fact, constitutionally suspect. Finally, the section explores arguments for applying more careful scrutiny to retroactive immigration statutes than has been applied to economic legislation.

A. Substantive Due Process Restrictions on Retroactive Legislation

Under modern substantive due process law, there is a line of cases addressing retroactivity and the potential unfairness of retroactive legislation.   n154 This body of case law requires that there be an acceptable rationale for the retroactive provisions of any legislation. It is not enough that the overall congressional plan be reasonable; instead there must be independent support for each respect in which Congress has chosen to make the statute retroactive.

The substantive due process retroactivity decisions are interesting not so much for their results, but for the way in which they analyze retroactivity issues. While nominally asking only the question whether there is a legitimate rational basis for the retroactive provisions,   n155 the Court's decisions upholding retroactive legislation reject proposed interests that ordinarily would be adequate to meet rationality requirements. Instead, these cases rely on the kind of congressional interests that ordinarily would be called for in cases requiring more careful judicial review.

For example, in Usery v. Turner Elkhorn Mining Co.,   n156 the Court considered a challenge by coal mine operators to a law that required black lung disease compensation to be paid to former employees. The   **[*133]**   Court began its analysis by stating that the justification for coal operators' retrospective liability for black lung disease must account for the possibility that the operators did not know of the dangers facing their employees and that, even if they did, they may have been acting in reliance on the then-existing state of the law which spared them from liability.   n157 It proceeded to state that it would hesitate to accept any rationale founded on the blameworthiness of the mining companies or deterrence of dangerous mining practices.   n158 It was only by finding a separate, permissible rationale - one of spreading the costs of black lung disease - that the Court concluded that the statute passed muster under the Due Process Clause.   n159

In other cases, the Court has emphasized how limited retroactivity was essential to the congressional plan under consideration. For example, in Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,   n160 the Court upheld a statute that penalized employers for terminating their participation in multiemployer

18

pension plans from the date such legislation was substantially agreed to by the drafting congressional committees. The Court noted that one of the issues that concerned Congress was that employers were withdrawing from multiemployer pension plans. In drafting the legislation, Congress therefore faced the possibility of creating an incentive for further withdrawals prior to the effective date of the new law, at a time when they were trying to stop the drain on multiemployer plans.    n161 Limited retroactivity, which equalized the rules during the pendency of the legislation and the time after enactment, served to prevent this perverse incentive. In finding the retroactive provisions to be reasonable, the Court noted that "the enactment of retroactive statutes 'confined to short and limited periods required by the practicalities of producing national legislation... is a customary congressional practice.'" n162

    A third group of cases justifies retroactivity as "curative" of unexpected interpretations of prior law. In General Motors Corp. v. Romein,    n163 the Court addressed a Michigan workers' compensation **[*134]** scheme. Following a decision of the Michigan Supreme Court interpreting the statute's liability rules, the Michigan legislature passed a retroactive amendment to the statute that effectively overturned the court's decision. The affected employers challenged the retroactive aspects of the new law. In dismissing their due process challenge, the Supreme Court stressed that the purpose of the statute was to "correct the unexpected results" of the state's high court.    n164 Similar logic was offered by the Court in its most recent due process retroactivity case. In upholding the retroactive aspects of a tax change in United States v. Carlton,    n165 the Court emphasized that the previous law had included an unintended loophole and that the retroactive new provisions were simply "curative" of this defect.    n166 The majority also emphasized that Congress had acted promptly upon discovering the loophole.    n167 In a concurrence, Justice O'Connor contrasted the law at issue in Carlton with a situation where Congress had no interest other than raising revenue. She wrote that "the governmental interest in revising the tax laws must at some point give way to the taxpayer's interest in finality and repose."    n168 She therefore found it significant that the tax change at issue in Carlton had a very short retroactive period. She offered the view that a period of retroactivity longer than the year preceding the session in which a law was enacted would raise "serious constitutional questions."    n169

    Together, these substantive due process cases stand for the proposition that the permissibility of any retroactive statute depends on a demonstration that some acceptable legislative purpose coherent with the statute as a whole is furthered by its specific retroactive features. But determining whether a particular rationale is sufficient depends on a deeper understanding of what it is that makes retroactive legislation troubling and why it is that some legislative purposes are not acceptable. Why is it that raising revenue would not have been an adequate rationale for Justice O'Connor in Carlton, or that deterrence was not a sufficient rationale in Turner Elkhorn? What is the link between the necessary legislative purpose and the Court's underlying concern about retroactive lawmaking?    **[*135]**


B. Understanding the Substantive Due Process Doctrine

Although the Court has squarely recognized that "retroactive legislation presents problems of unfairness that are more serious than those posed by prospective legislation,"     n170 the substantive due process cases have not articulated fully the reasons for rejecting some rationales for retroactive legislation while accepting others. The underlying framework for the Court's rulings can be discerned by reading the substantive due process cases together with the Court's statutory interpretation cases regarding the circumstances under which a statute will be read to apply retroactively.

In a series of cases that set out the rule that statutes will be read prospectively absent a clear congressional statement to the contrary, the Court has identified three major concerns with retroactive legislation.     n171 The first concern is to honor the expectations with which people live their lives. As explained by Justice Scalia in Kaiser Aluminum, "The principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal human appeal."     n172 As further explained by Justice Stevens in Landgraf, this principle reflects "elementary considerations of fairness [that] dictate that individuals have an opportunity to know what the law is and to conform their conduct accordingly." n173

In elaborating on the concept that people should have fair warning of the consequences of their actions, the Supreme Court has looked to the practical impact of changes in the law on past acts. Thus, it is not enough for someone to have known that conduct was wrong or in some way proscribed. Instead, what matters is whether the person had fair notice of the penalties that would be imposed for that conduct.     n174  **[*136]**

Some commentators have questioned the need to protect a person's expectations about the consequences of his or her conduct.     n175 They note that primary conduct takes place in the context of all sorts of expectations, many of which may prove to be wrong. An expectation about the market, for example, could influence a business investment or the purchase of a home. But we do not protect all of these expectations. Why, then, are expectations based on legal rules so troubling?

One answer is that legal rules are designed for the purpose of obtaining compliance with government norms. If the government wants to achieve compliance with its rules, it must live by those rules. By destabilizing the understanding of what rules will apply, retroactivity makes statute books a more and more unreliable predictor of the standards that will be applied.     n176

Another answer relates to concepts of governmental legitimacy. The expectations created by a set of government rules are not like other expectations. Instead, they are government-backed statements about what conduct is or is not permissible. No marketplace expectation can claim the same level of authority.     n177

Particular equities are at play when the government is engaged in dealmaking with individuals. As the Court recently reaffirmed in an ex post facto case, the constitutional limitations on civil and criminal retroactive legislation are necessary in order to "place[ ] limits on the sovereign's ability to use its

20

lawmaking power to modify bargains it has made with its subjects."   n178
Judicial scrutiny of retroactive legislation thus helps prevent an inherently
unfair bargaining system. In addition, it helps the government preserve its
position as a trustworthy negotiator.

A second and related concern with retroactivity is that it prevents people
from achieving a sense of repose. In her concurrence in Carlton, Justice
O'Connor suggested that, apart from the expectations that may have been present
at the time of any transaction, we should also be troubled by government action
that upsets the expectations **[*137]** that come with the passage of time.   n179
In what is somewhat of a laches argument, she wrote that at some point the
government's interest in the retroactive legislation must give way to the
taxpayer's interest in repose. The troubling aspect of retroactivity which she
identifies is not that the rules might be changed on a person who made a
transaction, as they certainly were in Carlton, but that the change could come
so late that it would impede the process of making the past the past and moving
on with one's life. Justice O'Connor's concept of repose finds support in Jill
Fisch's recent article on retroactivity. Fisch argues that retroactivity is most
problematic when it upsets a stable equilibrium. The longer a rule is in effect,
and the longer people have had to build their lives around that rule, the more
disruptive it will be if the government is permitted to reach back and alter
that rule.   n180

The third basic concern with retroactive legislation is its potential for
abuse. As the Court has explained, the legislature's "responsivity to political
pressures poses a risk that it may be tempted to use retroactive legislation as
a means of retribution against unpopular groups or individuals."   n181
Limitations on retroactive legislation serve to curb such "'arbitrary and
potentially vindictive legislation.'"   n182 As commentators have noted, this
concern has particular relevance in the criminal context and supports the
prohibition against retroactive criminal legislation found in the Ex Post Facto
Clause.   n183 More generally, it is sensitive to the fact that some groups are
unlikely to be effective actors in the political arena. Although prospective
legislation undoubtedly can have disparate impacts on disfavored groups, at the
very least it gives those groups a set of established rules with which they can
live to avoid those consequences.

When we return to the substantive due process case law, we can see how the
legislative rationales that were rejected by the Court failed to respect the
values underlying the presumption against retroactivity.   **[*138]**

Turner Elkhorn's rejection of "blameworthiness" as a rationale for a scheme
apportioning the costs of black lung disease   n184 is rooted in the notion that
blame can be based only on the conduct that is expected of people. If the law
does not set out standards for behavior, people cannot be expected to adhere to
that behavior. Blame cannot be levied on the basis of after-the-fact standards.
In a sense, the rejection of blameworthiness rationales is equivalent to saying
that, where blame will be apportioned, the Court will follow the principles of
ex post facto jurisprudence and no governmental interest will be deemed
sufficient to justify changing the rules that define the consequences of
criminal conduct.

21

Turner Elkhorn's rejection of a deterrence rationale is also connected to the idea that the rule of law sets the standards by which people must conform their conduct. If conduct is not proscribed at the time it is committed, a subsequent law cannot deter that conduct. Similarly, if the legal consequences of conduct are not severe at the time of the conduct, an after-the-fact change in those consequences will not have retrospective deterrent effect.     n185 In contrast, prospective rules can serve as a deterrent by making clear the consequences of engaging in the proscribed conduct.

Turner Elkhorn's affirmative requirement that the justification for retroactive liability take account of the possibility that coal operators had acted in reliance on the old law and that they were not aware of the dangers of coal mining operations is a statement that the values disfavoring retroactivity must be given some weight. In a sense, the Court said that Congress needed a rationale for its treatment of these coal operators that recognized the unfairness of retroactivity and sought to avoid unnecessary unfairness. This view is echoed by Justice O'Connor's discussion of revenue-raising rationales in Carlton.     n186 Since revenue production is a general interest and does not require retroactive lawmaking, it does not serve to explain why a particular law is retroactive. As such, it is not a sufficient reason for retroactive legislation.

In evaluating whether specific rationales justify retroactivity, the Court's decisions also suggest that there must be attention to the severity of the consequences of retroactivity. In an early case, Welch v. Henry,     n187 the Court stated that substantive due process prohibits ret-  **[*139]**  roactive laws that are particularly "harsh and oppressive."     n188 The Court has since stated that the concept of a prohibition against "harsh and oppressive" laws is not different from the prohibition against "arbitrary and irrational" laws.     n189 By implication, part of the analysis of whether retroactive application of a statute is arbitrary and irrational is whether it imposes an oppressive and harsh burden. This understanding of the basic requirements of substantive due process is closely connected to the Court's recent decision in BMW of North America, Inc. v. Gore,     n190 in which the Court struck down a disproportionate punitive damage award on substantive due process grounds.     n191 The Court concluded that the consequences of a large punitive damage award were too unpredictable and too harsh in light of the circumstances.     n192

C. Understanding the Outcomes
of the Economic Substantive Due Process Cases

Altogether, the reasoning and rhetoric of the retroactivity cases suggest a meaningful level of review in which the use of inappropriate rationales or the imposition of unjustified and unduly harsh outcomes require the invalidation of retroactive statutes. Nonetheless, no recent cases have actually struck down federal legislation as violative of substantive due process. The cases therefore present a paradox. If, in fact, the Court is simply rubber-stamping congressional policies, why is it taking such pains to find tailored justifications for retroactive legislation - especially in the economic sphere where a high level of deference to Congress has long been the standard? Conversely, if it is seriously reviewing the adequacy of the rationales for retroactivity, why is it almost always coming to results that uphold retroactive

22

legislation? Making sense of this paradox is a first step in understanding what substantive due process review of retroactive legislation might mean outside the economic context.

One answer to the paradox can be found in the relationship between constitutional and statutory interpretation rules. Standing alongside the rule that retroactive provisions require separate justifi- **[*140]** cation has been a vigorous statutory interpretation doctrine that disfavors retroactive legislation. Under this case law, Congress is presumed not to act retroactively unless it plainly expresses its intent to do so. As the Court explained in Landgraf, "Requiring clear intent assures that Congress itself has considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits."    n193

This statutory interpretation background has meant that the Court has addressed retroactivity as a constitutional matter only in those instances when Congress's intention was unambiguous. Thus, the due process cases have placed the Court in its most uncomfortable position - deciding whether to invalidate that which a coordinate branch of government clearly intended to do. One would expect the Court to proceed cautiously in exercising its ultimate power to invalidate clearly articulated legislative policies.

One might still wonder why the Court's decisions almost uniformly have upheld the challenged retroactive laws. Even with unambiguous congressional intent, the requirement of separate justification for retroactivity could still ensnare some laws. Indeed, Justice O'Connor's Carlton concurrence made clear that in her view the early cases invalidating retroactive taxes that were wholly new forms of tax were still good law and that a tax law reaching far back in time would pose significant constitutional difficulties.    n194 But the recent record is also clear - no retroactive statutes have been struck down on substantive due process grounds for more than sixty years.    n195 With this rec- **[*141]** ord, some commentators have questioned whether the doctrine has any ongoing vitality.    n196

But the mere absence of recent cases invalidating retroactive legislation should not be seen as the death of the doctrine. What comes before the Court is a function of the laws enacted by the legislative branch. If legislatures do not enact unfair and arbitrary retroactive laws, the Court will not have the occasion to pass on their legality. The nature of the cases could reflect deeply embedded societal norms disfavoring retroactive legislation. Those societal norms could mean that most statutes are written prospectively, following the traditional notion of the role of legislative rules.    n197 Indeed, in the tax area, a custom has arisen in which statutes are either written prospectively, with grandfathering provisions,    n198 or are written with short retroactive periods to cover the time in which legislation is pending.    n199 The Court therefore has only been called upon to evaluate retroactive legislation of a relatively mild form.

Norms disfavoring retroactivity can be expected to have the greatest play when the affected parties can effectively press their case before the legislature. As Harold Krent observes, retroactivity in the economic arena will often be blocked by the political process.    n200 Because the targets of retroactivity are an identifiable group, they are more likely to form effective

23

coalitions to protect their interests and thereby prevent retroactive legislation. n201 This is particularly true when the affected parties are powerful economic actors. As identified groups with money and strong interests to protect, they can be expected to fare reasonably well in the political process. n202 Indeed, that appears to have been the case in Pension Benefit. Although the legislation was originally written to be retroactive from February 27, 1979, the final version limited retroactivity to withdrawals from pension plans after April 29, 1979. n203 Senator Javits commented that the change reflected "strong political pressure by certain withdrawing employers who were caught by the earlier date." n204 And following the **[*142]** Supreme Court's decision in Pension Benefit, the withdrawing employers succeeded in going back to Congress and obtaining legislation that spared them from the retroactive effects of the law. n205 Plainly, these were not outsiders to the rough and tumble of lawmaking.

When parties who can be expected to fare well in the legislative process fail in that arena, it is all the more likely that there is a substantial governmental reason for the retroactive aspects of the legislation and that the reason is one that fits the legislative scheme. And, not surprisingly, each of the recent retroactivity cases in which the Court has upheld retroactive legislation has involved powerful players in the legislative arena. Those challenging retroactivity have included the mining industry, n206 employers, n207 corporations with millions of dollars in Iranian contracts, n208 and persons presenting problems associated with high income taxpayers. n209 When these players turned to the courts, they were not challenging last minute or poorly considered provisions. Instead they were challenging provisions that had received a full legislative hearing. In Pension Benefit, for example, Congress plainly debated the degree of retroactivity that, at the time, it saw as necessary to achieve the objective of stabilizing multi-employer pension schemes. Similarly, in Turner Elkhorn, Congress had taken on the question of developing a scheme for compensating the victims of black lung disease that would spread the costs of the disease fairly. It was no surprise that the scheme involved past operators. In each case, the Court faced a well considered congressional policy to apply the statute retroactively. n210 **[*143]**

The results in the cases may therefore be a product of the conditions under which the Supreme Court has entertained due process challenges to legislation. These conditions - clear congressional intent, a relatively inclusive political process, and embedded norms against unfair retroactive statutes - cannot be assumed to carry over to laws regarding the deportation of immigrants.

D. The Conditions Leading to Judicial Review
of Constitutionally Suspect Retroactive Immigration Laws

Each of the conditions present in past retroactivity cases may be absent in any consideration of retroactivity under the new immigration statutes. First, some of the new provisions may require the courts to engage in constitutional adjudication in the absence of clear congressional intent. Because of possible limitations on the courts' jurisdiction in deportation matters, the courts may be foreclosed from using Landgraf analysis to dodge constitutional issues. Both AEDPA and IIRIRA have been read as drastically curtailing the power of the federal courts to hear challenges to deportation orders. n211 Although the

issue continues to be the subject of litigation, the position of the government is that the federal courts can only hear cases involving "substantial constitutional questions."    n212 If this reading of the courts' **[*144]** jurisdiction prevails, the courts will not be able to avoid ruling on constitutional issues simply because Congress's intent is unclear.    n213

With respect to the political process, the courts almost certainly will be hearing issues where the affected parties had little or no voice in the political process. Lawful permanent residents cannot vote.    n214 Although their interests are represented by a few immigrant advocacy groups, these groups must juggle a wide range of immigrant issues.    n215 The interests of persons in the immigrant community with past convictions can, not unexpectedly, get lost in this larger agenda.    n216 Further- **[*145]** more, immigrants must tread softly in the political arena, where their participation in the political process is treated with suspicion.

Finally, general societal norms of fair treatment are most vulnerable when the legislature is considering the claims of a disfavored group. As the Court has long recognized in cases regarding state-level discrimination, immigrants are susceptible to serious discriminatory treatment.    n217 As outsiders, they are subject to the irrational fears and prejudices of those who have a voice in the political process. Those targeted by retroactive deportation statutes are doubly disadvantaged due to their past convictions. These political disadvantages mean that the Court will face retroactivity issues in contexts where the political process cannot be expected to be protective of basic norms against retroactivity. Indeed, this can be seen in the time dimension of the retroactivity issues raised by the new immigration statutes. Whereas tax retroactivity rarely extends for a period as long as two years,    n218 the AEDPA and IIRIRA are being applied to conduct occurring decades ago.    n219 It is also evident from the nature of the consequences of retroactivity. Although the tax, pension, and black lung cases all involved significant amounts of money, none of the cases raised the suggestion **[*146]** that a party would be bankrupted or extremely seriously harmed by the retroactive provisions. With retroactive deportation statutes, however, the harm is well-recognized to be among the most extreme that can be inflicted.    n220

Ironically, the Court may bear some of the blame for Congress's cavalier approach toward the unfairness of retroactive deportation laws. The Court's summary treatment of ex post facto deportation claims,    n221 coupled with its wide ranging rhetoric about the powers of Congress over "aliens,"    n222 may discourage serious congressional consideration of whether it is appropriate for a new law to be retroactive. As is set forth in greater detail in the next section, Congress nowhere offered real consideration to the propriety of retroactivity in AEDPA and IIRIRA. With some sections, it dotted the i's and crossed the t's to state clearly that it intended the provisions to be retroactive; but nowhere does one find an explanation of the reasons why these provisions were made retroactive or how such retroactivity furthered any congressional scheme.

The retroactive deportation statutes therefore will come to the courts in a far different posture than the economic statutes that have been the subject of past substantive due process challenges. Given the conditions under which they were drafted, AEDPA and IIRIRA are simply more likely to contain retroactivity

provisions that were poorly thought through or that are unconnected to the legitimate governmental interests that drive the prospective aspects of the legislation. Even under the same nominal standard that the Court has applied in economic cases, these statutes may well have trouble showing a legitimate governmental purpose that underlies the retroactive aspects of the legislation.

But the very reasons why the deportation retroactivity cases will look different from the economic retroactivity cases may also provide grounds for more careful review of the justifications for retroactivity in the deportation context. Returning to the basic concern that retroactive legislation will unfairly target unpopular groups, the deportation cases present retroactivity in a context in which the targeted group suffers the dual political disability of being made up of immigrants and persons convicted of crimes. As an unpopular group, it is **[\*147]** vulnerable in the political process and unlikely to be able to voice its interests effectively. The Court is therefore appropriately cast into a more active role in protecting the basic concept that people should have fair warning of the consequences of their conduct and that unpopular groups should not be targeted unfairly through retroactive legislation.    n223

The severity of the consequence of deportation may also provide grounds for more rigorous review.    n224 Not only is deportation recognized to be a severe sanction, but it is all the more severe when it is the unexpected consequence of decisions made in the criminal justice system. For the person who could have pled to a crime that would not have led to deportation, who could have fought the criminal charges, or who was not even running a risk of deportation under prior law, there is a vast and severe change in the consequences of past actions. This change is all the more severe when the unexpected consequences are imposed long after the relevant conduct. With time, as Justice O'Connor observed, there is an interest in repose.    n225 For the immigrant with a long-ago conviction who has served the sentence imposed for that crime, this interest can be seen in the establishment of a work life in this country, a family, and, as Justice Brandeis said, "all that makes life worth living."    n226

The question remains whether the new statutes can offer justifications for the consequences they impose on immigrants convicted of crimes. Public animosity towards immigrants does not alter the fact that government can regulate the lives of permanent residents in ways that differ from citizens.    n227 And current doctrine regarding the federal power over immigration means that immigration policy rationales can stretch far to justify deportation. But there are still limits on Congress's power. Even if the Court restricts itself to basic rationality analysis, the retroactive aspects of a statute must be separately justified by acceptable governmental interests.    **[\*148]**


IV


Applying Substantive Due Process Analysis to AEDPA and IIRIRA

Substantive due process analysis of retroactivity requires an acceptable legislative purpose for the retroactivity. Although AEDPA and IIRIRA contain a vast array of retroactivity formulations for different provisions,    n228 there is nothing in the House and Senate Reports accompanying either piece of

legislation that explains why various provisions were made to apply retroactively. Indeed, with regard to some of the provisions, there is nothing in the reports to indicate whether they were intended to be retroactive. The difficulty in identifying congressional purposes to support the retroactive reach of the new laws is illustrated by three of the new provisions.

A. AEDPA's Bars to Relief from Deportation

Under AEDPA, permanent residents are barred from relief from deportation if they are deportable for two crimes of moral turpitude, any drug crime other than a first-time possession of under thirty grams of marijuana, any firearm crimes, any aggravated felony, or other miscellaneous crimes.    n229 The bars for persons convicted of two crimes of moral turpitude, and for those convicted of drug possession or firearm charges, have since been lifted by IIRIRA;    n230 however, for people in proceedings commenced prior to April 1, 1997, the AEDPA bars continue to apply.    n231

For those whose cases were pending as of April 1, 1997, the general effective date for IIRIRA, the retroactivity of AEDPA is very important. Because IIRIRA does not generally apply to this group, they are not subject to the relief-limiting aspects of IIRIRA, such as the new clock-stopping rule. If courts conclude that AEDPA cannot be applied retroactively, this group will be returned to the pre-AEDPA state of the law in which persons with seven years of residence were eligible to apply for section 212(c) relief from deportation. [*149]

AEDPA's bars on relief from deportation were accompanied by little explanation. These provisions also contain no express statement that they are to be applied retroactively. Indeed, two courts have found that the better reading of the statute is that the bars on relief from deportation were not meant to be applied retroactively.    n232 Nonetheless, the Attorney General has interpreted the law to be retroactive and has taken the position that the courts can only hear constitutional challenges to this interpretation.

If courts are limited to constitutional evaluation of the retroactive application of AEDPA, they will face a novel substantive due process question. Instead of evaluating whether there is an adequate rationale for what Congress chose to do,    n233 they will be assessing whether retroactivity is permissible for a statute that Congress never meant to make retroactive. In this context, speculation about possible legislative purposes is a highly dubious enterprise. If Congress never meant a result, then it cannot have had a purpose for that result. The courts would not simply be saving Congress from the task of explaining why it did what it did; instead they would be pretending that Congress did what it never intended to do, and then offering reasons why it might be permissible for Congress to undertake such a policy.

Given the well established presumption that Congress would not make a statute retroactive without a clear statement to that effect,    n234    [*150] there is serious question whether a court should engage in this kind of speculation of possible legislative purposes. The purpose of the statutory rule requiring a clear statement of congressional intent for retroactivity is to require "that Congress itself has determined that the benefits of retroactivity outweigh the potential for disruption or unfairness."    n235 Where Congress has

27

made no such determination, courts run the real danger of upholding a law that impedes substantive values protected by the Due Process Clause, without any congressional assessment that treading on those values serves any purpose at all.

Even if courts are to speculate, the question is how retroactivity furthers an acceptable legislative scheme. In Mojica, Judge Weinstein addressed the constitutionality of the Attorney General's reading of AEDPA as requiring mandatory retroactive deportation.    n236 Drawing on the need for a separate rationale for retroactive effects, Judge Weinstein explored whether retroactive application could be justified by the prospective scheme that was put in place. n237 He concluded that the prospective scheme was quite different.    n238 As applied prospectively, immigrants are placed in deportation proceedings while they are in detention. They are denied bond and are thus denied the opportunity to return to the community and establish their good behavior and desirability. The law therefore is one that applies to people who are incarcerated or in detention. But, as applied retroactively, the law sweeps in people who could have spent years in the community since their crimes. It requires the deportation of people who are supporting their families, providing jobs for employees, and who otherwise are woven into the fabric of society. Justifications for a prospective scheme of incarceration and rapid deportation therefore are of little help in finding a rationale for retroactive application of a bar on relief from deportation.

It is particularly difficult to imagine a justification for applying retroactively the AEDPA provisions that were repealed by IIRIRA. Given the timing between convictions and the commencement of deportation proceedings, the Attorney General's interpretation of the law makes it almost a pure retroactive law with no prospective scheme.    n239 The rationale for retroactivity must therefore provide  [*151]  some account of why it is appropriate to mandate the deportation of a person convicted of one drug possession crime, for example, only if the deportation proceedings were pending on April 24, 1996, or commenced between April 24, 1996, and April 1, 1997. Certainly, none of the traditional rationales for retroactive statutes - curing defects in the law, preventing incentives during a transition to a new legal scheme, or furthering a congressional scheme - can explain why this group is targeted for mandatory deportation.    n240

B. IIRIRA's Clock-Stopping Provisions

IIRIRA's new clock-stopping rules present another situation where courts may face the constitutionality of retroactivity despite the absence of clear congressional intent to apply retroactively a new restriction on eligibility for relief from deportation.    n241 The Attorney General has not yet issued regulations concerning the implementation of these rules.    n242 Early indications, however, indicate that she is ignoring the issue of retroactivity and therefore is likely to apply this bar to relief without regard to when the underlying crime was committed.    n243

The clock-stopping rules can be traced to congressional concern about possible "abuse" of the system for obtaining relief from depor-  [*152]  tation. n244 One legislator stated that frivolous motions and appeals provided aliens

28

Case 1:02-cv-00045 Document 15 Filed in TXSD on 01/15/2003 Page 32 of 67

with the ability to buy time during their proceedings.    n245 As some
legislators put it, there was an "incentive" to delay proceedings so as to be
eligible for relief.    n246

Both the House and Senate versions of the bill eliminated this incentive by
providing that the time-clock for calculating eligibility for relief from
deportation stops at the commencement of deportation proceedings.    n247 The
House bill further provided that this provision would be effective for notices
to appear issued after the date of enactment.    n248 Thus, neither the Senate
nor the House bill precluded an immigrant from accumulating the necessary seven
years if that person was not yet in immigration proceedings.

The Conference Report stated that the Senate receded to the House version.
n249 But in fact, the Conference Report included language found in neither bill.
In the Conference Report language, the time-clock stops with the date of
commission of the crime or the commencement of proceedings, whichever is
earlier.    n250 No explanation was given for the change in language.    n251
Unlike the language from the two houses, the conference language, which is now
the law under IIRIRA, denies relief even in situations where there has been no
incentive to delay proceedings.

With respect to retroactivity, the final legislation provides a general
effective date of April 1, 1997; it does not speak specifically to the   [*153]
retroactivity of the new rule that eligibility for relief stops on the date that
the crime was committed.    n252 As with AEDPA's bar to section 212(c) relief,
the absence of such congressional intent should be sufficient to show that
Congress lacked the type of specific purpose required to justify retroactivity.
n253

Should courts reach the question of possible legislative rationales,
retroactive application of the new rule cannot be justified by congressional
concern about incentives to delay proceedings. Retroactive application hits
particularly hard those individuals who were not the targets of past INS
enforcement practices. They are now barred from relief despite the fact that
they could not have delayed proceedings that had not yet commenced.

Arguably, Congress's general purpose would have been furthered by denying
relief to those whose proceedings had already commenced and whose seven-year
period was due to accrue during these proceedings. But, ironically, the new
clock-stopping rules do not reach this group. Under section 309(c) of IIRIRA,
persons whose proceedings had commenced prior to April 1, 1997, generally will
continue to be handled under the pre-IIRIRA law.    n254 It is the persons who
had not yet been put in proceedings, and who therefore could not possibly have
delayed such proceedings, who are denied relief. No incentive-based reasoning
can appropriately reach this group.

Retroactive application of the clock-stopping provisions with respect to
persons who committed a single "crime involving moral turpitude" during their
first five years in the country also runs afoul of the "harsh and oppressive"
formulation of the substantive due process test for review of retroactive
legislation.    n255 Under the new definition of "crime involving moral
turpitude," many crimes that are treated leniently by the criminal justice
system are grounds for deportation if committed within the first five years of
residency.    n256 As applied prospectively, this rule raises the probationary

29

standard for new immigrants who, by definition, have more tenuous ties to the country and deports those who violate that standard. But as applied retroactively, the new definition of a crime of moral turpitude, coupled with retroactive application of the clock-stopping rules, means that long term residents who committed minor crimes in the past must now be deported. **[*154]** In some cases, they must be deported even though their crimes did not make them subject to deportation at the time the crimes were committed.

Even in Harisiades, where the Court upheld deportation of members of the Communist Party based on their past membership, the noncitizens were on notice at the time of their membership that it constituted grounds for deportation. n257 Despite this notice, the Court went to pains to explain the strong national interests that were served by deporting these persons after they had terminated their memberships. It discussed how Congress saw powerful interests at stake and noted that these interests had been found to be sufficient to justify discriminatory actions taken against United States citizens.    n258 Applying the new clock-stopping rules to persons who committed a single misdemeanor in the past and have since ·shown rehabilitation carries no comparable justification.

C. New Rules for "Aggravated Felons"

The new provisions on "aggravated felons" present the clearest evidence of congressional intent to apply new rules to past conduct. Prior to IIRIRA, most changes in the definition of "aggravated felony" had been made on a prospective basis.    n259 IIRIRA changed this pattern by making its new definition of aggravated felony fully retroactive to actions taken after IIRIRA's enactment. n260 IIRIRA also   **[*155]**   changed the consequences of an "aggravated felony" conviction for permanent residents by making it a bar to relief from deportation. Altogether, IIRIRA means that some who were not deportable in the past are now deportable as aggravated felons, and everyone who is deportable as an aggravated felon is barred from seeking relief from deportation.    n261

Although the retroactivity language, and the more severe definition of aggravated felony, are drawn from the Senate bill,    n262 there is nothing in the reports accompanying the bill that explains the reasons for retroactivity. Nor is there any explanation of the harsh treatment of persons convicted of crimes that are punished as misdemeanors under state law.    n263 Instead the legislative history focuses first on the   **[*156]**   assumption that all of the persons designated as "aggravated felons" are "felons" and second on the prospective scheme of detention and deportation.    n264

Retroactive application of the new "aggravated felony" bar to relief from deportation poses the risk of severe disruption of past expectations. By sweeping in crimes that were not even grounds for deportation under the old law, the aggravated felony bar means that persons who have entered pleas, or otherwise conducted their criminal cases with the expectation of being able to continue to live in the United States, will now be deported summarily. By making deportation mandatory where it was previously only a possibility, the new rule undermines expectations that reform and rehabilitation would provide good grounds for being able to remain in this country. The harshness is perhaps best exemplified in the case of drug charges. Almost all drug convictions have long served as grounds for deportation.    n265 But, under IIRIRA's bar to relief for

"aggravated felons," these deportability grounds have been converted into grounds for mandatory deportation. Even in a case where a permanent resident was raised in this country from a young age, follows the all too familiar pattern of experimenting with drugs, and then abandons any drug use, deporta- **[*157]** tion is automatic. While the young immigrant was surely on notice that drug use is a crime, she or he would not have been on notice that following the common patterns of American youth would lead the immigrant to be deported to a "home" country that, for all practical purposes, is a foreign country to that immigrant. As the Supreme Court recognized in Jordan v. De George,    n266 notice of the additional sanction of deportation is of constitutional moment.    n267

The question is then what justifications Congress may have had for such retroactive application. As with AEDPA, the prospective scheme cannot explain retroactivity. Like AEDPA, IIRIRA sets in place a system for immediate detention and removal of "aggravated felons" with no opportunity for bond or application for relief from deportation.    n268 But retroactive application looks very different from prospective application. Retroactive application sweeps in persons who were never subject to detention, either because their crimes were not grounds for deportation, because they were let out on bond, or because their crimes were not considered important enough by the INS to make them the subjects of INS enforcement practices. These people have therefore established their lives in the community. Retroactive application must in some way account for the drastic impact that the new law imposes on the lives they built under expectations fostered by the old scheme.    n269

The legislative history suggests one possible answer. In discussions of the bill, Senator Abraham, who sponsored the amendments to make the definition of "aggravated felony" harsher, expressed frustration with the way in which immigration judges and the BIA were exercising discretion to award relief from deportation.    n270 The per se bar for some felons can be seen as a legislative attempt to control the exercise of discretion by saying that no circumstances could justify relief from deportation when the crime is one classified as an "aggravated felony."

It could be argued that, under this rationale, the new law is "curative" of judicial decisions. But given the broad sweep of the new "ag- **[*158]** gravated felony" definition, there is nothing unanticipated about an immigration judge granting a waiver, for example, to a one-time offender who met the standards of the existing case law for relief from deportation. Whatever frustration some Senators may have had with the application of section 212(c) relief, there had been no dramatic change in administrative and judicial interpretations of the doctrine in the years prior to IIRIRA and AEDPA.    n271 Indeed the availability of relief from deportation was a longstanding aspect of the law and practice in immigration cases. By applying the new per se rule retroactively, the new laws reach back to cases in which immigrants had legitimate expectations that their efforts at rehabilitation could protect them from deportation. These expectations had important consequences not just for the immigrants, but also for their families, employers, employees, and communities. All of these persons relied on their lives not being disrupted by an after-the-fact change in the rules.

Furthermore, "curative" rationales for retroactive legislation have been limited to situations in which the legislature was responding quickly to an

31

unanticipated judicial construction or other unanticipated consequence of a
statute.    n272 As Justice O'Connor explained in Carlton, timeliness in
legislative retroactivity protects the interest in repose: the interest over
time in knowing that a system of rules that you have depended on will not be
disrupted.    n273 For immigrants with long past convictions, this interest can
be found in their actions to resume productive lives in their communities.
[*159]

    In addition, a "curative" rationale only addresses those persons who were
previously deportable. There can be no "cure" of immigration judges abusing
their discretion for cases that would not have given rise to deportation
proceedings prior to the new definition of "aggravated felony."

    Another view is that Congress simply has identified these persons as
undesirable - indeed the legislative history is full of references to aliens who
"prey" on Americans.    n274 The breadth of the new "aggravated felony"
definition, however, especially as applied to persons who have long since shown
their desirability, raises serious questions about the legitimacy of this
rationale. Can it be rational to say that a person is per se undesirable because
of a twenty-year-old conviction for selling a marijuana cigarette?

    Whether such a justification suffices depends in part on the care with which
the courts review retroactive deportation laws.    n275 Several factors together
point to the need to look carefully at efforts to deport people based on what
they once did as opposed to who they now are. First, there is the basic question
of the harshness of the laws. Although the Court has characterized Welch v.
Henry's    n276 prohibition of "harsh and oppressive" retroactive laws as an
aspect of rationality review,    n277 this very fact means that it is appropriate
for courts to examine the harshness of legislation in evaluating whether there
is an acceptable governmental purpose for retroactivity. Can removal of the
immigrant from the life built after serving any sentence - including his or her
family, friends, community, job, and property - be an appropriate consequence of
a crime that is long past? Can it be an appropriate sanction in the absence of
consideration of what the person has done since committing the crime? Can it
ever be appropriate when the underlying conviction was obtained through a system
that encourages plea bargains but later changes the terms of those bar-   [*160]
gains? An evaluation of harshness requires some consideration of the particular
crimes at issue and the justification for looking back in time at crimes for
which the person has long since served any sentence.

    Second, the political atmosphere in which legislatures decide issues related
to persons convicted of crimes coupled with the outsider status of immigrants
and their recognized inability to be heard in the political process mean that
political decisions regarding immigrants convicted of crimes are inherently
suspect.    n278 The very reasons that give rise to special ex post facto
constitutional rules for persons accused of crimes - namely, the predictable
hostility of legislatures to persons labeled as "criminal"    n279 - provide
reason to look carefully at how immigrants with past convictions are singled out
for harsh treatment in a charged legislative atmosphere.

    In the case of the new aggravated felony definition and the new bar on
relief for all persons denominated "aggravated felons," the tenor of the
congressional debate provides ample evidence that political hyperbole, and not

careful deliberation, characterizes this area of lawmaking. The fast and loose
treatment of these immigrants is found in the labeling of persons with old
misdemeanor convictions as "aggravated felons" and the suggestion that all under
this label are "preying" on American citizens. It is also found in Congress's
failure to articulate any justification for applying the bar on relief from
deportation retroactively. When confronted with such a casual disregard for the
traditional principles disfavoring retroactive legislation, it becomes the
courts' job to look carefully at the supposed justifications for retroactive
legislation and to determine whether those justifications in fact justify the
scope of the statute.

   Conclusion

   Through their limitations on jurisdiction and their harsh treatment of
permanent residents convicted of crimes, AEDPA and **[*161]** IIRIRA have brought
the constitutionality of retroactive deportation statutes back to the forefront.
Courts considering these issues can turn to a long tradition of substantive due
process cases that have cast a skeptical eye on efforts to legislate
retroactively. These cases require the type of rationale for retroactive
legislation that is missing in the new deportation statutes. In confronting the
myriad forms of retroactivity posed by these laws, courts should recognize that
fair treatment of the constitutional questions requires that they look carefully
at whether Congress has in fact authorized such retroactivity. Hopefully, where
Congress has taken that step, courts will move on to the harder question of
whether the type of retroactivity is adequately justified.

FOOTNOTES:

   n1. 347 U.S. 483 (1954).

   n2. 347 U.S. 522 (1954).

   n3. U.S. Const. art. I, 9, cl. 3.

   n4. Galvan, 347 U.S. at 530 (quoting Ng Fung Ho v. White, 259 U.S. 276, 284
(1922)).

   n5. Id. at 530 (quoting Fong Haw Tan v. Phelan, 333 U.S. 6, 10 (1948)).

   n6. Id. at 531.

   n7. Id. (quoting New York Trust Co. v. Eisner, 256 U.S. 345, 349 (1921)).

   n8. 163 U.S. 537 (1896).

   n9. As other commentators have noted, the landmark cases that have come to
stand for the proposition that the Court should refrain from overseeing
immigration policy for its constitutionality were issued within a few years of
Plessy. The decision in Chae Chan Ping v. United States, 130 U.S. 581 (1889)
(known as "The Chinese Exclusion Case"), which upheld Congress's exclusion of
immigrants of Chinese descent, was issued seven years before Plessy. Fong Yue
Ting v. United States, 149 U.S. 698 (1893), was issued just three years before
Plessy. The immigration cases built on the idea that race could be determinative
of a group's ability to assimilate as Americans. See, e.g., Chae Chan Ping, 130
U.S. at 606. Even one of the dissents in Fong Yue Ting, which protested the

failure to review deportation policies, referred to the affected immigrants as "the obnoxious Chinese." Fong Yue Ting, 149 U.S. at 743 (Brewer, J., dissenting).

n10. See Thurgood Marshall, An Evaluation of Recent Efforts to Achieve Racial Integration in Education Through Resort to the Courts, 21 J. Negro Educ. 316, 317 (1952) (discussing wholesale transfer of Plessy rule from context of interstate travel to education); infra note 130 (discussing ex post facto immigration cases).

n11. Although immigration case law developed in the 1950s around McCarthy-era concerns about Communists, the origins of the case law are firmly rooted in the racist rhetoric surrounding Asian immigrants. For a history of this period, see Lucy E. Salyer, Laws as Harsh as Tigers: Chinese Immigrants and the Shaping of Modern Immigration Law (1995); see also Stephen H. Legomsky, Immigration Law and the Principle of Plenary Congressional Power, 1984 Sup. Ct. Rev. 255, 288-89 (1984).

n12. Pub. L. No. 104-132, 110 Stat. 1214 (codified as amended in scattered sections of 8, 15, 18, 22, 28, 40, 42, 50 U.S.C.) [hereinafter AEDPA].

n13. Pub. L. No. 104-208, Div. C, 1996 U.S.C.C.A.N. (110 Stat.) 3009-546 (codified in scattered sections of 8 U.S.C.) [hereinafter IIRIRA].

n14. Under IIRIRA, deportation proceedings have been renamed as "removal proceedings." See IIRIRA 304(a)(3), 8 U.S.C. 1229-1229a (Supp. II 1996). Because this Article moves back and forth between pre-IIRIRA and post-IIRIRA law, it uses the traditional terminology of "deportation" to denote proceedings that determine whether a permanent resident must leave the country.

n15. As is explained infra, see notes 75-80 and accompanying text, the statutes vary in the degree to which they specify whether a provision should be applied retroactively. AEDPA's bar to relief is being applied retroactively pursuant to the decision of the Attorney General in In re Soriano. See Op. Att'y Gen., In re Soriano, 1996 WL 426888, at *38-*54 (Feb. 21, 1997), rev'g In re Soriano, No. A39186067, 1996 WL 426888, at *1-*38 (B.I.A. June 27, 1996). This interpretation of the law is currently being challenged in a number of cases. See infra notes 29-38 and accompanying text and note 232.

The bars to relief from deportation under the agency's interpretation of the new laws leave open a narrow form of relief for permanent residents who would face persecution in their home countries. IIRIRA restricts deportation where the Attorney General decides that "the alien's life or freedom would be threatened." IIRIRA 305(a)(3), 8 U.S.C. 1231(b)(3)(A) (Supp. II 1996). This relief is not available for those aliens who have committed a "particularly serious crime." See id. 305(a)(3), 8 U.S.C. 1231(b)(3)(B) (Supp. II 1996).

n16. For a discussion of the role of statutory construction in the evolution of the Court's jurisprudence in immigration cases, see Hiroshi Motomura, Immigration Law After a Century of Plenary Power: Phantom Constitutional Norms and Statutory Interpretation, 100 Yale L.J. 545 (1990) [hereinafter Motomura, Phantom Norms]; see also Daniel Kanstroom, Surrounding the Hole in the Doughnut: Discretion and Deference in U.S. Immigration Law, 71 Tul. L. Rev. 703, 713 (1997) (noting that "tendency of the federal courts is to resolve many difficult issues [in immigration law] by statutory rather than constitutional

34

interpretation"). The jurisdictional requirements will not foreclose the judiciary's other method for avoiding substantive constitutional issues - namely, the use of procedural surrogates. See Hiroshi Motomura, The Curious Evolution of Immigration Law: Procedural Surrogates for Substantive Constitutional Rights, 92 Colum. L. Rev. 1625 (1992) [hereinafter Motomura, Procedural Surrogates].

n17. In litigation under both AEDPA and IIRIRA, the Justice Department has taken the position that jurisdiction-stripping provisions of the laws - AEDPA 440(a), 110 Stat. at 1276-77 (repealed by IIRIRA 1996), and IIRIRA 309(c)(4)(G), 1996 U.S.C.C.A.N. (110 Stat.) at 3009-626 to -627 (codified at 8 U.S.C. 1101 note (Supp. II 1996)) - bar all judicial review except for review of "substantial constitutional questions." See, e.g., Respondents' Brief at 14-15, Henderson v. Reno (2d Cir. 1997) (Nos. 97-4050 & 97-4070) (on file with the author). The government reads the statutory provisions as bars to judicial review of both the agency's interpretation of the statute itself and the agency's determinations with regard to individual claimants. It takes the position, however, that these bars were not enacted with the necessary specific congressional intent to prevent review of substantial constitutional questions. See, e.g., id. at 15 ("There is nothing in the IIRIRA that demonstrates Congress's intent to preclude judicial review of colorable constitutional claims."). In contrast, immigrant advocates argue that the jurisdiction-stripping provisions preserve traditional district court habeas jurisdiction over any unlawful custody - including custody that is unlawful as a matter of statutory law. See, e.g., Petitioners' Brief at 14-31, Henderson (on file with author).

n18. See, e.g., Gutierrez-Martinez v. Reno, No. Civ. A. 1:97CV3361TWT, 1998 WL 7459, at *3 (N.D. Ga. Jan. 8, 1998) (finding jurisdiction limited to "a grave constitutional error or a fundamental miscarriage of justice); Jurado-Gutierrez v. Greene, 977 F. Supp. 1089, 1091-94 (D. Colo. 1997) (finding jurisdiction over constitutional violations and upholding equal protection challenge to AEDPA, section 440(d)).

n19. See, e.g., Costello v. INS, 376 U.S. 120, 128-29 (1964); Kessler v. Strecker, 307 U.S. 22, 30 (1939).

n20. See, e.g., Lehman v. United States, 353 U.S. 685, 689 (1957) (construing Immigration and Nationality Act of 1952, in which Congress specified that the new law applied "'notwithstanding...that the facts, by reason of which any such alien [is made deportable], occurred prior to the date of enactment of this Act'" (alteration in original) (quoting Immigration and Nationality Act of 1952, Pub. L. No. 82-414, 241(d), 66 Stat. 163, 208 (codified at 8 U.S.C. 1251(d) (1988) (repealed 1991)) [hereinafter INA]); United States v. Yacoubian, 24 F.3d 1, 7 (9th Cir. 1994) (construing statute in which Congress specified that deportation law would apply "'notwithstanding that...the facts, by reason of which an alien is [made deportable], occurred before the date of the enactment of this Act'" (emphasis added) (quoting Immigration Act of 1990, Pub. L. No. 101-649, 602(c), 104 Stat. 4978, 5081-82)).

n21. For a discussion of the pressure placed on constitutional doctrine if the new jurisdictional rules limit statutory challenges to deportation, see Lenni B. Benson, Back to the Future: Congress Attacks the Right to Judicial

35

Review of Immigration Proceedings, 29 Conn. L. Rev. 1411, 1484-94 (1997). Pressure is also placed on constitutional issues by agency interpretations of statutes that find retroactivity in the absence of clear congressional intent. In this setting, the agency argues that its interpretation of the statute as requiring retroactivity should be given deference. Whether courts will conclude that such deference is due in this context depends on the clarity of congressional intent and the degree to which courts are willing to defer to agency interpretations that contradict the strong statutory interpretation doctrine disfavoring retroactivity. See, e.g., Mojica v. Reno, 970 F. Supp. 130, 180 (E.D.N.Y. 1997) (concluding that no deference is due to Attorney General's interpretation of AEDPA 440(d)).

n22. 349 U.S. 302 (1955).

n23. See id. at 320-21 (Douglas, J., dissenting).

n24. See, e.g., Galvan v. Press, 347 U.S. 522, 532-33 (1954) (Black, J., dissenting); Harisiades v. Shaughnessy, 342 U.S. 580 (1952) (Douglas, J., dissenting); Fong Yue Ting v. United States, 149 U.S. 698, 740-41 (1893) (Brewer, J., dissenting).

n25. See Scheidemann v. INS, 83 F.3d 1517 (3d Cir. 1996). The law at issue in Scheidemann was the Immigration Act of 1990, Pub. L. No. 101-649, 511(a), 104 Stat. 4978, 5052 (repealed by IIRIRA 1996), which barred aggravated felons who had served five years in prison from seeking relief from deportation.

n26. Scheidemann, 83 F.3d at 1527, 1531 (3d Cir. 1996) (Sarokin, J., concurring).

n27. See infra note 130; see also Peter Schuck, The Transformation of American Immigration Law, 84 Colum. L. Rev. 1, 25-27 (1984) (discussing the legal fiction that deportation is a "civil" penalty).

n28. See infra notes 154-210 and accompanying text.

n29. 970 F. Supp. 130 (E.D.N.Y. 1997) (consolidating Mojica v. Reno, No. CV97-1085(JBW) and Navas v. Reno, No. CV97-1869(JBW)).

n30. See id. at 169-71. Judge Weinstein rejected the Attorney General's ruling that AEDPA applies retroactively to bar relief from deportation. See Op. Att'y Gen., In re Soriano, 1996 WL 426888, at *38-*54 (Feb. 21, 1997), rev'g In re Soriano, No. A39186067, 1996 WL 426888, at *1-*38 (B.I.A. June 27, 1996). The Attorney General ruled on the retroactivity of AEDPA 440(d) in highly unusual proceedings. As a general matter, administrative decisions interpreting the Immigration and Nationality Act are issued by the Board of Immigration Appeals (BIA). With respect to the retroactivity of AEDPA 440(d), the BIA issued a decision in In re Soriano, No. 39186067, 1996 WL 426888, at *1-*38 (B.I.A. June 27, 1996). It concluded that section 440(d) should not be applied retroactively to those who already had been placed in deportation proceedings and had applied for relief, but that it could be applied retroactively to those with past convictions who had not yet been put in proceedings and who had applied for relief. The governing regulations allow the Immigration and Naturalization Service (INS) to request that the Attorney General review a decision of the BIA. See 8 C.F.R. 3.1(h)(1)(iii) (1996). The INS invoked this rule and asked the Attorney General to review this decision. On August 29, 1996, the matter was

referred to the Office of Legal Counsel in a memorandum requesting advice on whether the Attorney General should review the matter. The memorandum noted that the INS had suggested soliciting the views of the parties and amici from the Soriano case. See Memorandum from Seth Waxman, Associate Deputy Attorney General, U.S. Dep't of Justice, to Christopher Schroeder, Acting Assistant Attorney General, Office of Legal Counsel 1 (Aug. 29, 1996) (received in response to Freedom of Information request) (on file with author). Meanwhile, the Solicitor General was before the Supreme Court in the case of INS v. Elramly, 73 F.3d 220 (9th Cir. 1995), cert. granted, 116 S. Ct. 1260, vacated, 117 S. Ct. 31 (1996) (remanding for consideration in light of AEDPA), which, among other issues, raised questions about the retroactivity of section 440(d). On September 5, 1996, the Supreme Court requested briefing on the question of section 440(d)'s retroactivity. On September 12, 1996, the very day briefs were due in the Supreme Court, the Attorney General issued a one-paragraph order vacating the BIA's decision in Soriano and stating that she would be considering the issue on the merits. See Petitioner's Supplemental Brief, 1996 WL 528331, at *1a, Elramly (No. 95-939). That same day, a copy of the Attorney General's order was attached to the Solicitor General's brief. See id. It was only after the vacate order that the Attorney General invited any briefing in the Soriano matter from parties other than the INS on the retroactivity of section 440(d). On February 21, 1997, the Attorney General issued her decision overturning the BIA decision and concluding that section 440(d) was fully retroactive. Interestingly, her opinion quoted language from the Solicitor General's brief in the Elramly case. See Op. Att'y Gen., In re Soriano, 1996 WL 426888, at *45-*46 (Feb. 21, 1997) (citing Petitioner's Supplemental Brief, 1996 WL 528331, at *35, Elramly (No. 95-939)).

In the proceedings before the Attorney General, I played two roles. I wrote to the Attorney General following the vacate order requesting that she invite briefing from interested parties. When such briefing was invited, I co-authored a brief for the National Legal Aid and Defender's Association and the National Association of Criminal Defense Attorneys on the settled expectations affected by retroactive application of section 440(d).

n31. See Mojica, 970 F. Supp. at 140.

n32. The INS refrained from action despite the fact that Mojica had repeated contacts with the INS, including an application for U.S. citizenship. See id. at 140-41.

n33. See id. at 141.

n34. See id. at 139.

n35. See id. at 139-40.

n36. See infra notes 154-69 and accompanying text.

n37. See Mojica, 970 F. Supp. at 170-71.

n38. Id. at 171.

n39. See id. at 172-73.

n40. Immigration and Naturalization Service, State Population Estimates: Legal Permanent Residents and Aliens Eligible to Apply for Naturalization (Nov. 20, 1996) <http://www.ins.usdoj.gov/hqopp/lprest.html>.

n41. Immigration and Naturalization Service, Statistics: Table 8: Immigrants Admitted by Sex and Age: Fiscal Years 1994-96 (last modified Oct. 24, 1997) <http://www.ins.usdoj.gov/stats/annual/fy96/1011.html>.

n42. INA 321, 8 U.S.C. 1432 (1994).

n43. T. Alexander Aleinikoff, Citizens, Aliens, Membership and the Constitution, 7 Const. Comm. 9, 23 (1990).

n44. See generally Linda S. Bosniak, Membership, Equality, and the Difference that Alienage Makes, 69 N.Y.U. L. Rev. 1047, 1095-1101 (1994) (examining Supreme Court cases that recognize that aliens are entitled to criminal trials and other constitutional protections).

n45. See INA 241(a)(2)(A)(i), 8 U.S.C. 1251(a)(2)(A)(i) (1994) (amended and redesignated as INA 237(a)(2)(A)(i), 8 U.S.C. 1227(a)(2)(A)(i) (Supp. II 1996)).

n46. There is no ready definition of "crimes involving moral turpitude." Instead, the term has been defined through agency and circuit court case law, which in turn looks to the elements of a crime under state law. The case law holds that it is the nature of the crime, as described by the statute, not the facts and circumstances of the particular case, that determines whether an act is a crime of moral turpitude. See Goldeshtein v. INS, 8 F.3d 645, 647 (9th Cir. 1993). Furthermore, "neither the seriousness of the offense nor the severity of the sentence imposed is determinative." In re Serna, 20 I. & N. Dec. 579, 581 (B.I.A. 1992). What matters is whether there is an element of the crime that is "per se morally reprehensible and intrinsically wrong or malum in se." Id. at 582 (citing In re Flores, 17 I. & N. Dec. 225, 227 (B.I.A. 1980)); see also In re Phong Nguyen Tran, 1996 WL 170083 (B.I.A. Mar. 28, 1996) (interim decision) (conviction for crime involving moral turpitude where immigrant was convicted of a misdemeanor and sentenced to 30 days in jail).

The reliance on the formal elements of the crime can lead to the anomalous treatment of crimes across state lines. For example, the case law establishes that any crime including fraud is a "crime involving moral turpitude." Jordan v. De George, 341 U.S. 223, 232 (1951). Applying this standard to state statutes, the case law provides that the classification of convictions for a variety of fraud-related crimes depends on whether the state treats intent to defraud as an element of the offense. Compare In re Bart, 20 I. & N. Dec. 436, 438 (B.I.A. 1992) (Georgia conviction for issuance of bad check is crime involving moral turpitude because guilty knowledge, indicating intent to defraud, is element of offense), with In re Balao, 20 I. & N. Dec. 440, 443-44 (B.I.A. 1992) (Pennsylvania conviction for issuance of bad check is not crime involving moral turpitude because intent to defraud is not element of offense). Given the identical criminal conduct, the person who pleads guilty to issuance of a bad check under Pennsylvania law will not be treated as having a conviction for a crime involving moral turpitude, while the one who enters a plea under Georgia law will.

38

n47. See INA 241(a)(2)(A)(ii), 8 U.S.C. 1251(a)(2)(A)(ii) (1994) (amended and redesignated by IIRIRA as INA 237(a)(2)(A)(ii), 8 U.S.C. 1227(a)(2)(A)(ii) (Supp. II 1996)).

n48. See INA 241(a)(2)(A)(iii), 8 U.S.C. 1251(a)(2)(A)(iii) (1994) (amended and redesignated by IIRIRA as INA 237(a)(2)(A)(iii), 8 U.S.C. 1227(a)(2)(A)(iii) (Supp. II 1996)). The crimes treated as aggravated felonies prior to the 1996 changes in the law can be found at INA 101(a)(43), 8 U.S.C. 1101(a)(43) (1994) (amended by AEDPA and IIRIRA 1996). Prior to 1996, the aggravated felony ground for deportation was largely repetitious of the other grounds. For example, drug convictions that constituted aggravated felonies were also independently grounds for deportation under a provision for deporting persons convicted of drug crimes. See infra note 49. Similarly, any person who had two crimes involving moral turpitude was deportable so that it did not matter if the crimes were aggravated felonies. In some cases, however, the aggravated felony definition served to authorize deportation for a single crime, where the person would not otherwise have been deportable. For example, a person convicted of a murder committed more than five years after entering the country, who had no other criminal record, would have been deportable only as an aggravated felon. A noncitizen is only deportable by reason of an aggravated felony if the conviction post-dates 1988, the year in which this deportation ground was added. See Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, 7344(a), 102 Stat. 4181, 4470-71 (codified as amended at INA 237(a)(2)(A)(iii), 8 U.S.C. 1227(a)(2)(A)(iii) (Supp. II 1996)).

n49. See INA 241(a)(2)(B), 8 U.S.C. 1251(a)(2)(B) (1994) (amended and redesignated by IIRIRA as INA 237(a)(2)(B), 8 U.S.C. 1227(a)(2)(B) (Supp. II 1996)).

n50. See INA 241(a)(2)(C), 8 U.S.C. 1251(a)(2)(C) (1994) (amended and redesignated as INA 237(a)(2)(C), 8 U.S.C. 1227(a)(2)(C) (Supp. II 1996)).

n51. See INA 241(a)(2)(D), 8 U.S.C. 1251(a)(2)(D) (1994) (redesignated as INA 237(a)(2)(D), 8 U.S.C. 1227(a)(2)(D) (Supp. II 1996)). The section on miscellaneous crimes includes espionage, see 18 U.S.C. 792-99 (1994), sabotage, see 18 U.S.C. 251-56 (1994), threats against the President and successors to the presidency, see 18 U.S.C. 871 (1994), expedition against a friendly nation, see 18 U.S.C. 960 (1994), violation of the Military Selective Service Act, see 50 U.S.C. App. 451-73 (1994), violation of the Trading with the Enemy Act, see 50 U.S.C. App. 1-44 (1994), and violations of certain INA provisions, see 8 U.S.C. 1185, 1328 (1994).

n52. The circuits were divided as to the nature of the seven year requirement. Some held that permanent residence and seven years of domicile were independent conditions for section 212(c) eligibility. See, e.g., White v. INS, 75 F.3d 213, 215 (5th Cir. 1996); Lok v. INS, 548 F.2d 37, 40-41 (2d Cir. 1977). Others held that eligibility for section 212(c) waiver required seven consecutive years of domicile as a permanent resident. See, e.g., Chiravacharadhikul v. INS, 645 F.2d 248, 248-49 (4th Cir. 1981); Castillo-Felix v. INS, 601 F.2d 459, 467 (9th Cir. 1979).

n53. Section 212(c) provided that

39

aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General without regard to [their excludability].... The first sentence of this subsection shall not apply to an alien who has been convicted of one or more aggravated felonies and has served for such felony or felonies a term of imprisonment of at least 5 years.

INA 212(c), 8 U.S.C. 1182(c) (1994) (repealed by IIRIRA 1996). Although section 212(c) by its terms applied to returning residents, courts and the BIA had interpreted the provision to apply to residents who had not left the country but faced deportation. See Francis v. INS, 532 F.2d 268, 273 (2d Cir. 1976); In re Silva, 16 I. & N. Dec. 26, 29-30 (B.I.A. 1976) (adopting Francis as nationwide policy). Prior to Francis, equitable relief was available to immigrants with domestic convictions who had traveled at some time in the past or who were eligible for adjustment of status. See Francis, 532 F.2d at 271 (describing evolution of BIA case law).

n54. The BIA took the position that the period of lawful domicile continued up until the time of a final administrative order. See In re Lok, 18 I. & N. Dec. 101, 105 (B.I.A. 1981), aff'd, 681 F.2d 107 (2d Cir. 1982). Most circuits upheld this position. See Goncalves v. INS, 6 F.3d 830, 834 (1st Cir. 1993); Nwolise v. INS, 4 F.3d 306, 310-12 (4th Cir. 1993); Jaramillo v. INS, 1 F.3d 1149, 1155 (11th Cir. 1993); Katsis v. INS, 997 F.2d 1067, 1075 (3d Cir. 1993); Variamparambil v. INS, 831 F.2d 1362, 1366-67 (7th Cir. 1987); Rivera v. INS, 810 F.2d 540, 541-42 (5th Cir. 1987). The Ninth Circuit, however, held that lawful residence for the purpose of eligibility for section 212(c) relief continued through judicial review on the merits of a deportation order. See Wall v. INS, 722 F.2d 1442, 1444-45 (9th Cir. 1984). But see Foroughi v. INS, 60 F.3d 570, 575 (9th Cir. 1995) (stating that lawful permanent resident status of alien conceding deportability continues only until final administrative order of deportation).

n55. The Attorney General's powers over deportation under the INA are divided between the INS and the Executive Office for Immigration Review (EOIR). See 8 C.F.R. 2.1, 3.0-.41 (1997). In deportation proceedings, the INS acts as the prosecutor and the EOIR acts as the administrative court. Within EOIR, the immigration judge is the officer who initially hears cases, decides on motions, and issues decisions. See 8 C.F.R. 3.12-.37 (1997). The decisions of an immigration judge may be appealed to the BIA, which is another branch of the EOIR. See 8 C.F.R. 3.1, 3.38-.39 (1997).

n56. See In re Marin, 16 I. & N. Dec. 581, 584-85 (B.I.A. 1978) (listing considerations that support granting relief under section 212(c)).

n57. The bar on relief for "aggravated felons" was introduced by the Immigration Act of 1990, Pub. L. No. 101-649, 511, 104 Stat. 4978, 5052 (amending INA 212(c), 8 U.S.C. 1182(c) (1994)) (repealed by IIRIRA 1996). Previously, the aggravated felony label had served primarily to invoke a set of procedural rules that expedited deportation. Although noncitizens are not deportable as aggravated felons if the conviction pre-dates 1988, see supra note 48, the bars to relief from deportation for aggravated felons apply when a person is deportable by reason of another category (e.g., drug crime) and the

40

crime is also classified as an aggravated felony. Under the pre-1996 law, the bar to relief applied to persons who served five years in prison. Putting these provisions together, a person deportable by reason of a drug conviction, whether or not it pre-dated 1988, would have been barred from relief from deportation if she or he served five years in prison.

n58. As a matter of practice, the INS did not seek to deport all immigrants convicted of crimes. Especially where a crime was treated leniently by the criminal process, there was no effort to track the immigrant and put the person in deportation proceedings. See Removal of Criminal and Illegal Aliens, 1995: Hearing Before the Subcomm. on Immigration and Claims of the House Comm. on the Judiciary, 104th Cong. 4, 29 (1995) (statement of T. Alexander Aleinikoff, General Counsel, INS) (explaining that state sentencing was used as a "mark of the seriousness of the offense"). Depending on INS enforcement priorities, a person could be in the community for years, either after serving the criminal sentence or not having received a prison sentence, without ever being faced with a deportation proceeding. Years later, a trip outside the country, an application for a replacement permanent resident card, or an application for citizenship could bring the person to the attention of the INS and lead to the institution of deportation proceedings. The waiver process meant that all that had happened in the person's life in the intervening years would be relevant to the decision whether to terminate permanent residency status and deport the individual.

n59. See Mojica v. Reno, 970 F. Supp. 130, 178 (E.D.N.Y. 1997) (citing U.S. Department of Justice Executive Office for Immigration Review Statistical Sheet 1, Jan. 19, 1995).

n60. It is unclear whether the new detainer provisions will apply to persons who are never sentenced to any prison time. The detention provisions of IIRIRA state that the Attorney General shall take into custody persons who are deportable due to criminal convictions "when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense." IIRIRA, Pub. L. No. 104-208, 303(a), 1996 U.S.C.C.A.N. (110 Stat.) 3009-546, 3009-585 (codified at INA 236(c)(1), 8 U.S.C. 1226(c)(1) (Supp. II 1996)). The terminology of release suggests that the person must have been in custody. But arguably, anyone sentenced to time served or probation is being "released."

n61. The INA provides for commencing deportation proceedings during incarceration for certain categories of noncitizens. Currently, those categories include noncitizens who are deportable due to two convictions for crimes involving moral turpitude or any conviction for a drug crime. See INA 238(a)(1), 8 U.S.C. 1228(a)(1) (Supp. II 1996). Prior to 1996, the law provided for expedited deportation proceedings in prison only for persons convicted of aggravated felonies. See INA 242A(a), 8 U.S.C. 1252a(a) (1994) (amended and transferred to 8 U.S.C. 1228 (1996)), originally enacted as the Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, 7347(a), 102 Stat. 4181, 4471-72 (1988).

n62. See INA 236(c), 8 U.S.C. 1226(c) (Supp. II 1996) (criminal aliens are taken into custody by the INS when released from incarceration, and may be released on bond only if such release will provide protection for a witness).

41

This aspect of the legislative scheme is not fully in effect, because the agency exercised the statutory option to certify that crowding in detention facilities precluded immediate implementation of mandatory detention. See 62 Fed. Reg. 48,183 (Sept. 22, 1997) (describing certification by INS on October 9, 1996).

n63. The new law uses the term "admission" rather than "entry." The law defines "admission" as lawful entry into the United States after inspection and authorization by an immigration officer. See 8 U.S.C. 1101(a)(13)(A) (Supp. II 1996).

n64. Under IIRIRA, relief from deportation is called "cancellation of removal." IIRIRA 304(a)(3), 1996 U.S.C.C.A.N. (110 Stat.) at 3009-594 (codified at 8 U.S.C. 1229b (Supp. II 1996)).

n65. See 8 U.S.C. 1227(a)(2)(A)(i)(II) (Supp. II 1996) (enacted by AEDPA, Pub. L. No. 104-132, 435(a), 110 Stat. 1214, 1274 (1996)).

n66. In New York, petty theft is punishable as a class A misdemeanor with a maximum sentence of one year. See N.Y. Penal Law 155.25 (McKinney 1988).

n67. See IIRIRA 304(a)(3), 1996 U.S.C.C.A.N. (110 Stat.) 3009-546, 3009-595 (codified at INA 240A(d)(1), 8 U.S.C. 1229b(d)(1) (Supp. II 1996)). This section resolves the dispute over the nature of the residency that is required for eligibility for relief from deportation. It requires that the permanent resident be a permanent resident for five years and that she or he reside in the United States continuously for seven years after having been lawfully admitted under any status. See id. 304(a)(3), 1996 U.S.C.C.A.N. (110 Stat.) at 3009-594 (codified at 8 U.S.C. 1229b(a) (Supp. II 1996)). The second of these requirements is subject to the clock-stopping rule.

n68. The precise scope of the clock-stopping bar is somewhat unclear. As with many other provisions of IIRIRA, it has not yet been the subject of litigation, and there are no BIA decisions stating the agency's interpretation of its reach. The text of the rule states:

Any period of continuous residence or continuous physical presence in the United States shall be deemed to end when the alien is served a notice to appear under section 239(a) [8 U.S.C. 1229(a)] or when the alien has committed an offense referred to in section 212(a)(2) [8 U.S.C. 1182(a)(2)] that renders the alien inadmissible to the United States under section 212(a)(2) [8 U.S.C. 1182(a)(2)] or removable from the United States under section 237(a)(2) [8 U.S.C. 1227(a)(2)] or 237(a)(4) [8 U.S.C. 1227(a)(4)], whichever is earliest.

IIRIRA 304(a)(3), 1996 U.S.C.C.A.N. (110 Stat.) 3009-595 (codified at 8 U.S.C. 1229b(d)(1) (Supp. II 1996)). By requiring that the crime be one "referred to in section 212(a)(2) [8 U.S.C. 1182(a)(2)]," the text appears to limit the clock-stopping provision to those crimes that are grounds for inadmissibility. Arguably, this limitation means that a crime involving moral turpitude that fits within the exceptions to inadmissibility would not act to stop the clock. If read this way, the bar to relief from deportation for persons being deported for a single crime of moral turpitude would only apply to those who are sentenced to a term of more than six months or who are convicted of an offense that carries a

42

possible sentence of more than one year. See INA 212(a)(2)(A)(ii), 8 U.S.C. 1182(a)(2)(A)(ii) (1994 & Supp. II 1996).

n69. See IIRIRA 321(a), 1996 U.S.C.C.A.N. (110 Stat.) at 3009-627 to -628, and AEDPA 440(e), 110 Stat. at 1277-78 (codified at INA 101(a)(43), 8 U.S.C. 1101(a)(43) (Supp. II 1996)).

n70. See IIRIRA 321(a)(3), 1996 U.S.C.C.A.N. (110 Stat.) at 3009-627 (codified at INA 101(a)(43)(G), 8 U.S.C. 1101(a)(43)(G) (Supp. II 1996)).

n71. See INA 101(a)(43)(G), 8 U.S.C. 1101(a)(43)(G) (1994) (amended 1996).

n72. See 8 U.S.C. 1229b(a)(3) (Supp. II 1996).

n73. See infra note 263.

n74. See AEDPA, Pub. L. No. 104-132, 440(d), 110 Stat. 1214, 1277 (1996) (repealed by IIRIRA 1996). For those whose proceedings started prior to AEDPA's effective date, the bar to relief applies if the crimes involving moral turpitude led to a sentence of a year or more. For those whose proceedings post-date AEDPA's effective date, the bar to relief applies if the crimes were punishable by a year in prison, regardless of whether they led to any sentence. See AEDPA 435(b), 110 Stat. at 1275 (codified at 8 U.S.C. 1227 note (Supp. II 1996)).

n75. IIRIRA 309(c) provides transition rules for persons in deportation proceedings at the time of the "effective date" of IIRIRA, which was April 1, 1997. See IIRIRA 309(a), 1996 U.S.C.C.A.N. (110 Stat.) 3009-546, 3009-625 (codified at 8 U.S.C. 1101 note (Supp. II 1996)). Under the transition provisions, the general rule is that the IIRIRA amendments will not apply. See id. 309(c)(1), 1996 U.S.C.C.A.N. (110 Stat.) at 3009-625 (codified at 8 U.S.C. 1101 note (Supp. II 1996)). In cases where a hearing has not yet been held, the Attorney General has an "option" to apply the new procedures. See id. 309(c)(2), 1996 U.S.C.C.A.N. (110 Stat.) at 3009-626 (codified at 8 U.S.C. 1101 note (Supp. II 1996)). The Attorney General also has the "option" to terminate and reinitiate proceedings for persons who were in proceedings as of April 1, 1997. See id. 309(c)(3), 1996 U.S.C.C.A.N. (110 Stat.) at 3009-626 (codified at 8 U.S.C. 1101 note (Supp. II 1996)).

Although these transition rules appear to hold out some hope for immigrants who are ineligible for relief under AEDPA, but are eligible for relief under IIRIRA, this hope has not been realized. The Attorney General's regulations state that she will issue a notice in the Federal Register of any decision to apply the option to terminate and reinitiate proceedings. See 62 Fed. Reg. 10,312, 10,371 (Mar. 6, 1997) (creating new 8 C.F.R. 240.16). No such notice has been issued. Immigration practitioners confirm that they are unaware of any cases in which the Attorney General has permitted a pre-IIRIRA case to proceed under IIRIRA's standards. See Telephone Interview with Yvonne Floyd-Mayers, Staff Attorney, The Legal Aid Society (Dec. 12, 1997).

n76. See AEDPA 440(f), 110 Stat. at 1278 (codified at 8 U.S.C. 1101 note (Supp. II 1996)) (limiting application of the new definition of aggravated felonies to offenses committed on or after the date of enactment).

n77. See, e.g., IIRIRA 321(b), 1996 U.S.C.C.A.N. (110 Stat.) at 3009-628 (codified at 8 U.S.C. 1101 note (Supp. II 1996)) (changing INA definition of

aggravated felony to apply to convictions entered before, on, or after the date of enactment of IIRIRA).

n78. See, e.g., AEDPA 435(b), 110 Stat. at 1275 (codified at 8 U.S.C. 1227 note (Supp. II 1997)) (limiting application of new definition of moral turpitude prospectively to persons not yet under deportation proceedings).

n79. See IIRIRA 309(a), 1996 U.S.C.C.A.N. (110 Stat.) at 3009-625 (codified at 8 U.S.C. 1101 note (Supp. II 1997)) (setting forth the general effective date of IIRIRA).

n80. See, e.g., AEDPA 440(d), 110 Stat. at 1277 (repealed by IIRIRA 1996). In Mojica and Yesil, the district courts found that section 440(d) was best interpreted as prospective. See Mojica v. Reno, 970 F. Supp. 130, 168-82 (E.D.N.Y. 1997); Yesil v. Reno, 973 F. Supp. 372, 374 (S.D.N.Y. 1997). The courts noted that other provisions of AEDPA were explicitly retroactive, leading to the negative implication that section 440(d) is prospective. See also Lindh v. Murphy, 117 S. Ct. 2059, 2063 (1997) (finding, by negative implication, that habeas provisions of AEDPA could not be applied retroactively.)

n81. See Mirta Ojito, U.S. Frees Immigrant Jailed for 1974 Misdemeanor, N.Y. Times, Oct. 25, 1997, at B1.

n82. See In re Jesus Collado-Munoz, No. A31-021-716, at 2 (B.I.A. Dec. 18, 1997) (on file with the New York University Law Review).

n83. See Ojito, supra note 81.

n84. See Mirta Ojito, Old Crime Returns to Haunt an Immigrant, N.Y. Times, Oct. 15, 1997, at B1.

n85. See id.

n86. See Ojito, supra note 81.

n87. Mr. Collado can argue that under the text of the rule, he should be spared this fate because he did not serve more than six months in prison. See supra note 68. Mr. Collado could also argue that the new clock-stopping rule should not be applied retroactively. Under the general effective date provisions of IIRIRA, the statute became "effective" on April 1, 1997. See IIRIRA, Pub. L. No. 104-208, 309(a), 1996 U.S.C.C.A.N. (110 Stat.) 3009-546, 3009-625 (codified at 8 U.S.C. 1101 note (Supp. II 1996)). But as the Supreme Court recognized in Landgraf v. USI Film Prods., 511 U.S. 244, 257-58 (1994), a statement that a statute becomes "effective" on a particular date does not even arguably suggest that it has any application to conduct that occurred at an earlier date. In the case of the clock-stopping rule, becoming "effective" could mean that the new statute stops the clock for persons committing crimes after that date. Given the substantive implications of the clock-stopping provisions in determining the availability of relief, this would be the preferred reading of the statute under Landgraf principles. In addition, the existence of a specific provision on the retroactivity of the clock-stopping rule for notices to appear, see IIRIRA 309(c)(5), 110 Stat. at 3009-627 (codified as amended at 8 U.S.C. 1101 note (Supp. II 1997)), combined with Congress's failure to include any such specific provision with respect to retroactive application of the clock-stopping rule based on the date that a crime was committed, suggests that Congress chose not to make the clock stop retroactively based on the commission of the crime. Of

44

course, all of these arguments depend on the existence of a forum that will hear statutory claims.

n88. Mr. Collado could argue that the definition should not apply to misdemeanor convictions. See infra note 263. But if he loses this statutory argument, the government would probably argue that he has no route for judicial review.

n89. See supra note 75.

n90. See Op. Att'y Gen., In re Soriano, 1996 WL 426888, at *38-*54 (Feb. 21, 1997).

n91. See supra note 75.

n92. As a matter of practice, the INS did not seek out and institute deportation proceedings against persons who were not given prison sentences. See supra note 58. Had the INS nonetheless initiated proceedings, Ms. H. would have been deportable as a person who was convicted of an offense relating to a controlled substance, other than a single offense involving possession for one's own use of 30 grams or less of marijuana. See 8 U.S.C. 1251(a)(2)(B) (1994) (amended and transferred in 1996 to 8 U.S.C. 1227(a)(2)(B)). But prior to AEDPA, she would have been eligible for relief from deportation. If the possession charge were her sole conviction, she would have had an excellent chance of receiving a waiver.

n93. This corresponds to the date of the enactment of AEDPA.

n94. Under section 309(a) of IIRIRA, this is the effective date on which section 304(b) of IIRIRA repealed section 212(c) of the old INA. See IIRIRA, Pub. L. No. 104-208, 304(b), 1996 U.S.C.C.A.N. (110 Stat.) 3009-546, 3009-597 (codified at 8 U.S.C. 1182(c) note (Supp. II 1996)); id. 309(a), 1996 U.S.C.C.A.N. (110 Stat.) at 3009-625 (codified at 8 U.S.C. 1101 note (Supp. II 1996)).

n95. Under pre-AEDPA law, she clearly was entitled to apply for relief, because she was a permanent resident with seven years of continuous residence. Under IIRIRA, Ms. H. would not be barred from relief because a single conviction for possession of marijuana does not meet the definition of an "aggravated felony." See infra note 263 (discussing scope of aggravated felony definition for drug crimes).

n96. See supra note 75.

n97. This consequence flows from the fact that all "drug trafficking" crimes, which would include such a sale, are classified as "aggravated felonies," irrespective of whether they are a first offense or are treated as misdemeanors by the state. See 8 U.S.C. 1101(a)(43)(B) (1994) (incorporating definitions in 18 U.S.C. 924(c)(2) (1994)). As aggravated felonies, they serve as a bar to any relief from deportation under both AEDPA 440(d) and IIRIRA 304(a)(3). See AEDPA, Pub. L. No. 104-132, 440(d), 110 Stat. 1214, 1277 (1996) (repealed by IIRIRA 1996); IIRIRA 304(a)(3), 1996 U.S.C.C.A.N. (110 Stat.) at 3009-594 (codified as amended at 8 U.S.C. 1229b(a)(3) (Supp. II 1996)).

n98. See The Legal Aid Society, Testimony on the Need for Legislation Requiring a Criminal Defendant to be Notified of the Possible Immigration Ramifications of a Guilty Plea 8 (May 6, 1997) (on file with author).

n99. For example, in Yesil v. Reno, 973 F. Supp. 372, 384 (S.D.N.Y. 1997), the permanent resident facing deportation had cooperated with prosecutors by infiltrating a drug organization. The court found that he had done so at great risk to his life.

n100. Both of these crimes are class A misdemeanors in New York and are subject to a potential sentence of one year. Stealing an orange is petty larceny, see N.Y. Penal Law 155.25 (McKinney 1988), while jumping a turnstile can be charged as theft of services, see N.Y. Penal Law 165.15(3) (McKinney 1988). As theft crimes, both of these examples fit within the accepted definition of a crime involving moral turpitude.

n101. See supra notes 65-68 and accompanying text.

n102. See Gerald L. Neuman, Strangers to the Constitution 132 (1996) ("To lead more fulfilling lives, immigrants develop knowledge, skills, and relationships - they 'invest in human capital' - that would be wasted if they had to return to their country of origin.").

n103. See Celia W. Dugger, After Crime She Made a New Life, but Now Faces Deportation, N.Y. Times, Aug. 11, 1997, at A8 (describing effect of mandatory deportation law on Vietnamese immigrant who immigrated at age of four, does not speak Vietnamese, and has three children who do not speak Vietnamese).

n104. See, e.g., Respondents' Brief at 44-62, Henderson v. Reno (2d Cir. 1997) (Nos. 97-4050 & 97-4070) (on file with author); Appellees' Brief at 37-41, Goncalves v. INS (1st Cir. 1997) (No. 97-1953) (on file with author).

n105. See Lindsey v. Washington, 301 U.S. 397, 401 (1937) (finding retroactive changing of maximum sentence into mandatory sentence violates Ex Post Facto Clause). Although Lindsey is an ex post facto case, and therefore cannot be applied directly to the immigration context, it sets forth principles for understanding when a change affecting a criminal conviction is retrospective. The courts consistently have recognized the relevance of ex post facto jurisprudence to the general question of when a noncriminal law should be seen as having retroactive effect. See, e.g., Hughes Aircraft Co. v. United States, 117 S. Ct. 1871, 1876 (1997) (citing ex post facto cases); Landgraf v. USI Film Prods., 511 U.S. 244, 269 (1994) (same).

n106. See Weaver v. Graham, 450 U.S. 24, 33-34 (1981).

n107. Some courts have concluded that changes in eligibility for relief from deportation are not "retroactive" because they merely change the availability of a discretionary form of relief that the immigrant could not have counted on obtaining. See, e.g., Scheidemann v. INS, 83 F.3d 1517, 1523 (3d Cir. 1996); De Osorio v. INS, 10 F.3d 1034, 1042 (4th Cir. 1993). But, while the award of section 212(c) relief is discretionary, there is an undisputed right to apply for such relief and have the application considered under criteria that constrain the immigration judge's discretion. See supra text accompanying note 56. The elimination of eligibility for this relief therefore takes away a right that the person previously possessed. See Yesil v. Reno, 973 F. Supp. 372, 382

46

(S.D.N.Y. 1997) ("A right to discretionary relief is still a substantive right, and the elimination of even the possibility of obtaining relief thus has a retroactive effect."); see also Scheidemann, 83 F.3d at 1528 (Sarokin, J., concurring); Mojica v. Reno, 970 F. Supp. 130, 179-80 (E.D.N.Y. 1997). For an analysis of these arguments, see Anjali Parekh Prakesh, Note, Changing the Rules: Arguing Against Retroactive Application of Deportation Statutes, 72 N.Y.U. L. Rev. 1420, 1449-57 (1997) (concluding that deportation for past crimes is retroactive for purposes of Landgraf analysis).

n108. Galvan v. Press, 347 U.S. 522, 531 (1953) (quoting New York Trust Co. v. Eisner, 256 U.S. 345, 349 (1921)).

n109. See infra notes 124-29 and accompanying text.

n110. See Stephen H. Legomsky, Immigration and the Judiciary: Law and Politics in Britain and America 195-205 (1987); Neuman, supra note 102, at 118-38; Aleinikoff, supra note 43 at 10-29; Louis Henkin, The Constitution and United States Sovereignty: A Century of Chinese Exclusion and Its Progeny, 100 Harv. L. Rev. 853, 858-63 (1987); Stephen H. Legomsky, supra note 11, at 260-78 (1984); Motomura, Procedural Surrogates, supra note 16, at 1627; Motomura, Phantom Norms, supra note 16, at 606-07; Peter H. Schuck, The Transformation of Immigration Law, 84 Colum. L. Rev. 1, 34-53 (1984); Charles D. Weisselberg, The Exclusion and Detention of Aliens: Lessons from the Lives of Ellen Knauff and Ignatz Mezei, 143 U. Pa. L. Rev. 933, 1004-19 (1995).

n111. See Wong Wing v. United States, 163 U.S. 228, 238 (1896) (holding due process applies to "all persons," not just citizens).

n112. See, e.g., Graham v. Richardson, 403 U.S. 365 (1971). But see Mathews v. Diaz, 426 U.S. 67, 81-84 (1976) (invoking the plenary power doctrine to justify weaker scrutiny of federal discrimination against aliens).

n113. See Yick Wo v. Hopkins, 118 U.S. 356, 374 (1886).

n114. See Aleinikoff, supra note 43, at 18.

n115. See generally Salyer, supra note 11, at 2-23.

n116. See Neuman, supra note 102, at 123.

n117. See id. at 136-38; Aleinikoff, supra note 43, at 12; Legomsky, supra note 11, at 261-69; Weisselberg, supra note 110, at 1019.

n118. See Neuman, supra note 102, at 121; Motomura, Procedural Surrogates, supra note 16, at 1692; see also Mojica v. Reno, 970 F. Supp. 130, 146-52 (E.D.N.Y. 1997).

n119. See Motomura, Procedural Surrogates, supra note 16, at 1656-1703 (describing distortion of doctrine due to pressure to rely on procedural grounds instead of substantive constitutional norms); Motomura, Phantom Norms, supra note 16, at 560-80 (describing impact of use of statutory interpretation to implement phantom constitutional norms).

n120. See Legomsky, supra note 11, at 269-70; Schuck, supra note 110, at 48.

n121. See Neuman, supra note 102, at 119-25.

n122. In Landon v. Plascencia, 459 U.S. 21 (1982), the Court ruled that, despite the plenary power doctrine, a returning resident with substantial ties to the United States was entitled to greater procedural protections than a new entrant. The Court stated: "Once an alien gains admission to our country and begins to develop ties that go with permanent residence, his constitutional status changes accordingly." Id. at 32; see also Mathews v. Diaz, 426 U.S. 67 (1976) (upholding limitations on Medicare benefits for permanent residents of less than five years, noting that they had less substantial ties to country).

In general, the terminology of "plenary power" has rarely arisen in cases involving long term permanent residents. In a search of the terms "plenary" with variation of the words "aliens" and "immigration," the terms arise in nineteen Supreme Court cases that refer to governmental regulation of noncitizens. Four are cases involving the conditions for entry as an immigrant or as an applicant for a temporary visa - a situation that is arguably far different from that of long time permanent residents. See Kleindienst v. Mandel, 408 U.S. 753, 766 (1972) (upholding Attorney General's denial of temporary visa and noting that Congress exercised plenary power to "'make rules for the admission of aliens and to exclude those who possess those characteristics which Congress has forbidden'" (quoting Boutilier v. INS, 387 U.S. 118, 123 (1967))); Boutilier v. INS, 387 U.S. 118, 123 (1967) (relying on Congress's "plenary power to make rules for the admission of aliens" to uphold law excluding homosexuals); Lloyd Sabaudo Societa Anonima per Azioni v. Elting, 287 U.S. 329, 335 (1932) (upholding levy of fines imposed without trial on those who bring in aliens suffering from specified diseases as "incident to the exercise by Congress of its plenary power to control the admission of aliens"); Oceanic Steam Navigation Co. v. Stranahan, 214 U.S. 320, 334-35 (1909) (finding Congress may choose administrative imposition of fines without involvement of judiciary, pursuant to its plenary power). One involved a returning resident, who at the time was understood to stand in the same constitutional shoes as a first-time immigrant. See Lapina v. Williams, 232 U.S. 78, 91 (1914). Five are references to the power of Congress over undocumented aliens. See INS v. Chadha, 462 U.S. 919, 959 (1983) (striking down legislative veto for undocumented persons gaining lawful permanent resident status through suspension of deportation); United States v. Valenzuela-Bernal, 458 U.S. 858, 864-66 (1982) (upholding conviction for transportation of illegal immigrants despite deportation of illegal alien witnesses on basis of Congress's plenary power to regulate admission of aliens); Nyquist v. Mauclet, 432 U.S. 1, 20 n.3 (1977) (Rehnquist, J., dissenting) (referring to federal government's plenary power over undocumented aliens); Lloyd Sabaudo, 287 U.S. at 335; Oceanic Steam, 214 U.S. at 334-35. Three concern the relative power of the federal and state governments. See Toll v. Moreno, 458 U.S. 1, 26 (1982) (Rehnquist, J., dissenting) (contending that federal power over immigration and naturalization, while plenary, does not preempt field of regulations once federal authorities have admitted aliens into country); Plyler v. Doe, 457 U.S. 202, 226 (1982) (referring to federal plenary authority as basis for regulations governing admissions and status in case regarding state policies towards undocumented children); Foley v. Connelie, 435 U.S. 291, 303 (1978) (Marshall, J., dissenting) (contending that federal control over aliens is plenary so that state has no power to limit employment of police officers to citizens). Three contain qualifiers that suggest that plenary power does not preclude judicial review. See Chadha, 462 U.S. at 940-41 (noting that "plenary"

48

power over immigration must be implemented by "constitutionally permissible means"); Hampton v. Mow Sun Wong, 426 U.S. 88, 101 (1976) ("We do not agree...that the federal power over aliens is so plenary that any agent of the National Government may arbitrarily subject all resident aliens to different substantive rules from those applied to citizens." (emphasis added)); Scales v. United States, 367 U.S. 203, 222 (1961) (reference to Congress's "far more plenary power over aliens" (emphasis added)). One refers to the "plenary power" over immigrants to explain that deportation is not punishment. See Fleming v. Nestor, 363 U.S. 603 (1960) (upholding denial of Social Security benefits to person deported for membership in Communist Party). In seven cases, the terms only arise in dissents or concurring opinions. See Sale v. Haitian Centers Council, Inc., 509 U.S. 155 (1993); Toll v. Moreno, 458 U.S. 1 (1982); Foley v. Connelie, 435 U.S. 291 (1978); Nyquist v. Mauclet, 432 U.S. 1 (1977); Oyama v. California, 332 U.S. 633 (1948); Bridges v. Wixon, 326 U.S. 135 (1945); Schneiderman v. United States, 320 U.S. 118 (1943). Some of these concurrences or dissents question the whole idea of the doctrine and its relevance for the Court's decisions outside the context of initial immigration decisions. The term arises with respect to deportation in only one case. See Carlson v. Landon, 342 U.S. 524, 534 (1952) (permitting detention during the pendency of deportation proceedings).

For a discussion of the differing positions of new immigrants and long term permanent residents, see Aleinikoff, supra note 43, at 18 (arguing that within conception of community membership, permanent residents should be accorded most membership rights).

n123. See Legomsky, supra note 11, at 299-303; Schuck, supra note 110, at 54-72.

n124. See Legomsky, supra note 110, at 180-211; see also Salyer, supra note 11, at 94-116 (describing the litigation strategy and political context in which plenary power doctrine developed).

n125. 130 U.S. 581 (1889).

n126. See Fong Yue Ting v. United States, 149 U.S. 698, 707 (1893) (stating that "right of a nation to expel or deport foreigners... is as absolute and unqualified as the right to prohibit and prevent their entrance into the country").

n127. See Ekia v. United States, 142 U.S. 651, 660 (1892) ("As to such persons, the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law.").

n128. See, e.g., Yamataya v. Fisher, 189 U.S. 86, 101 (1903) (known as "The Japanese Immigrant Case") (deciding that Japanese immigrant has right to "an opportunity to be heard upon the questions involving his right to be and remain in the United States"). See generally Motomura, Procedural Surrogates, supra note 16, at 1637-45 (discussing development of procedural rights in deportation proceedings).

n129. See, e.g., Galvan v. Press, 347 U.S. 522, 531 (1954).

n130. See, e.g., Marcello v. Bonds, 349 U.S. 302, 314 (1955) (holding that Ex Post Facto Clause does not apply to deportation under Immigration and

49

Nationality Act of 1952 for past conviction under Marihuana Tax Act); Mahler v. Eby, 264 U.S. 32, 37 (1924) (finding deportation for past convictions under Espionage Act and Selective Draft Act appropriate); Bugajewitz v. Adams, 228 U.S. 585, 591 (1913) (stating in dicta that Ex Post Facto Clause does not apply to deportation). This is not to say that there is not much to criticize about the ex post facto cases. The rule that deportation falls outside the reach of the Ex Post Facto Clause was announced in Bugajewitz, a case that did not even present the question of retroactivity. See id. (accepting Government's argument that Bugajewitz was deportable for conduct that post-dated the enactment of the new statutory deportation grounds). Bugajewitz cited a prior case, Johannessen v. United States, 225 U.S. 227 (1912), in which the Court had held that an alien who had fraudulently obtained citizenship could be stripped of citizenship. Unlike retroactive deportation laws that are applied to lawful permanent residents, the statute at issue in Johannessen involved removal of a certificate that Johannessen never rightfully deserved. Nothing in the case suggests that Johannessen could suffer a new penalty beyond the taking away of his improper gain. Indeed, the Court went out of its way to make clear that there was no additional penalty. See Johannessen, 225 U.S. at 241. When the Court was presented with a retroactive statute in Mahler, it treated the question of the applicability of the Ex Post Facto Clause as settled by prior precedent. See Mahler, 264 U.S. at 37.

A central weakness of the ex post facto cases is that they proceed on a simplistic form of syllogistic reasoning. They announce that the Ex Post Facto Clause only applies to criminal cases, that deportation is civil, and that the Ex Post Facto Clause therefore cannot apply to deportation. But the question should be whether deportation is operating as a criminal sanction in the circumstances presented. Unlike Bugajewitz, where deportation followed an act deemed unacceptable, and "the coincidence of the local penal law with the policy of Congress [was] an accident," Bugajewitz, 228 U.S. at 591, subsequent deportation statutes have made deportation the necessary consequence of a conviction. Indeed, the current deportation statutes depend on the fortuity of how each state chooses to run its criminal justice system and make a person more likely to be deported in a state that has higher maximum sentences for a given crime, even if that state actually sentences people to lesser sentences. They have also created the following anomaly. The immigrant is processed through a criminal proceeding, with all of the rights of such a proceeding, including protection from ex post facto laws that would alter any sentence. This system has its own set of rules and conventions, including an extensive system of plea bargaining; but the results of that system with respect to deportation can be changed unilaterally by the government in ways that are far more detrimental to the immigrant than a change in the rules governing probation or the treatment of good-time credits.

The legislative history of IIRIRA also shows the sophistry of treating deportation as something other than punishment. Senator Roth, for example, described the new law's provisions on "aggravated felons" as follows: "The bill broadens the definition of aggravated felon to include more crimes punishable by deportation." 142 Cong. Rec. S4600 (daily ed. May 2, 1996) (statement of Senator Roth) (emphasis added).

n131. 342 U.S. 580 (1952).

n132. See id. at 584-88.

n133. Id. at 591.

n134. See id. at 590.

n135. 323 U.S. 214 (1944).

n136. See Harisiades, 342 U.S. at 591.

n137. See id. at 589-91. For the influence of the Cold War, see Weisselberg, supra note 110, at 1002-03.

n138. 347 U.S. 522 (1954).

n139. See id. at 531.

n140. Id. at 529.

n141. 341 U.S. 223 (1951).

n142. Id. at 225.

n143. See id. at 231.

n144. See id. at 232.

n145. 387 U.S. 118 (1967).

n146. In Boutilier, the Court considered a vagueness challenge to a statute that provided for the exclusion of persons "afflicted with psychopathic personality." Id. at 118. The Court again found that deportation statutes must withstand vagueness review. But because the statute in question was an exclusion statute that governed who could be admitted into the country, the Court concluded that the facts of the case could not raise vagueness issues. See id. at 123-24.

n147. The vagueness doctrine is in part concerned with people having fair notice of the law that will govern their conduct. See Jordan v. De George, 341 U.S. 223, 230 (1951). It is also about having fair notice of the standards that will be applied in any adjudicative proceeding and about curbing arbitrary decisions in such proceedings. See id. at 238-39 (Jackson, J., dissenting). These latter concerns about adjudicative proceedings are closely tied to contemporary notions of procedural due process. Although the former could be seen as a procedural right, the underlying interest in knowing what the law is for purposes of structuring one's behavior is a core concern of the substantive due process retroactivity cases and traditionally has been viewed as a substantive right.

n148. Jordan, 341 U.S. at 230.

n149. See id. at 231 (citing Fong Haw Tan v. Phelan, 333 U.S. 6, 10 (1948)).

n150. See id. at 232.

n151. See Boutilier, 387 U.S. at 123-24.

n152. 430 U.S. 787 (1977).

n153. Id. at 793 n.5. Several commentators have noted that Fiallo creates a chink in the doctrine of plenary power. See Neuman, supra note 102, at 15;

51

Stephen H. Legomsky, Ten More Years of Plenary Power: Immigration, Congress, and the Courts, 22 Hastings Const. L.Q. 925, 934-37 (1995).

Limitations on the plenary power doctrine can be found in other cases as well. In Kleindienst v. Mandel, 408 U.S. 753, 769-70 (1972), the Court upheld a decision to deny a temporary visa to a Marxist speaker. The Court noted that there was a "facially legitimate and bona fide reason" for the government's decision. Id. at 770. It expressly reserved the question of what course it would take if faced with a decision that did not meet that test. See id. at 769-70. Most recently, in INS v. Chadha, 462 U.S. 919, 956-59 (1983), the Court stated that the plenary power of Congress over immigration must be implemented by constitutionally permissible means. See also Reno v. Flores, 507 U.S. 292, 306 (1993) (recognizing that INS regulation must rationally advance some legitimate governmental purpose).

n154. See, e.g., United States v. Carlton, 512 U.S. 26 (1994) (allowing limited retroactivity for Congress to close inadvertent tax loophole); Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717 (1984) (permitting limited retroactivity to reduce incentive for employer withdrawal from multiemployer pension plans prior to effective date of statute); Usery v. Turner Elkhorn Mining Co., 428 U.S. 1 (1976) (upholding constitutionality of retroactive imposition of liability on coal mining companies for workers developing black lung disease); see also Landgraf v. USI Film Prods., 511 U.S. 244 (1994) (construing amendment of Civil Rights Act allowing imposition of damages so as not to impose retroactive liability).

n155. See, e.g., Carlton, 512 U.S. at 30-31; Pension Benefit, 467 U.S. at 729-30.

n156. 428 U.S. 1 (1976).

n157. See id. at 17.

n158. See id. at 17-18.

n159. See id. at 18-19.

n160. 467 U.S. 717 (1984).

n161. See id. at 730-31.

N162. Id. at 731 (quoting United States v. Darusmont, 449 U.S. 292, 296-97 (1981)). Similar reasoning appears in a number of cases challenging retroactive tax laws. See Darusmont, 449 U.S. at 297 (per curiam) (upholding application of 1976 tax change to federal minimum tax to transactions occurring in 1976 but prior to enactment); see also United States v. Hemme, 476 U.S. 558, 571 (1986) (upholding retroactive application of phase-in rule which prevented taxpayers who already had taken advantage of lifetime exemption under prior law from taking advantage of credit under new scheme).

n163. 503 U.S. 181 (1992).

n164. Id. at 191.

n165. 512 U.S. 26 (1994).

n166. See id. at 31.

n167. See id. at 32-33.

n168. Id. at 37-38 (O'Connor, J., concurring).

n169. Id. at 38 (O'Connor, J., concurring).

n170. General Motors Corp. v. Romein, 503 U.S. 181, 191 (1992).

n171. See Hughes Aircraft Co. v. United States, 117 S. Ct. 1871 (1997); Landgraf v. USI Film Prods., 511 U.S. 244 (1994); Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827 (1990). Although these cases are concerned with statutory interpretation, they note the interconnectedness of statutory and constitutional analyses of retroactivity. See supra note 105.

n172. Kaiser Aluminum, 494 U.S. at 855 (Scalia, J., concurring).

n173. Landgraf, 511 U.S. at 265; see also General Motors, 503 U.S. at 191 (stating that unfairness of retroactive legislation results from depriving citizens of legitimate expectations and upsetting settled transactions).

n174. See Landgraf, 511 U.S. at 283-84 ("The extent of a party's liability, in the civil context as well as the criminal, is an important legal consequence that cannot be ignored."); Weaver v. Graham, 450 U.S. 24, 28-30 (1981) (finding important for Ex Post Facto Clause purposes whether sanction imposed is greater than that in effect at time that crime was committed); cf. supra text accompanying notes 149-51 (discussing right under vagueness doctrine to fair notice of immigration consequences of criminal conduct).

n175. See, e.g., Michael J. Graetz, Retroactivity Revisited, 98 Harv. L. Rev. 1820, 1822-25 (1985); Stephen R. Munzer, A Theory of Retroactive Legislation, 61 Tex. L. Rev. 425, 427-36 (1982).

n176. See Jill E. Fisch, Retroactivity and Legal Change: An Equilibrium Approach, 110 Harv. L. Rev. 1055, 1105-06 (1997) (arguing that stable equilibrium of legal rules "enhances the ability of legal rules to affect primary conduct").

n177. See id. at 1106 ("The government engenders greater respect for its laws and its lawmaking institutions if it can commit to the stability of its laws.").

n178. Lynce v. Mathis, 117 S. Ct. 891, 895 (1997).

n179. See United States v. Carlton, 512 U.S. 26, 37-38 (1994) (O'Connor, J., concurring); see also Landgraf, 511 U.S. at 266 (noting that Due Process Clause protects interest in repose).

n180. See Fisch, supra note 176, at 1102. As Jill Fisch describes the issue, there are real costs to disrupting a stable legal equilibrium in which people have well established expectations of what the law is and how it might change. In contrast, in an unstable equilibrium, where the legal rules are in flux, there is less reason to preserve the force of any particular set of rules that were in place at any one time.

n181. Landgraf, 511 U.S. at 266.

n182. Id. at 267 (quoting Weaver v. Graham, 450 U.S. 24, 29 (1981)).

n183. See, e.g., Harold J. Krent, The Puzzling Boundary Between Criminal and Civil Retroactive Lawmaking, 84 Geo. L.J. 2143, 2168-73 (1996).

n184. See Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 17-18 (1976).

n185. See Landgraf, 511 U.S. at 263 (noting that damage remedies will affect before-the-fact private planning).

n186. See United States v. Carlton, 512 U.S. 26, 37-38 (1994) (O'Connor, J., concurring).

n187. 305 U.S. 134 (1938).

n188. See id. at 147.

n189. See Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 733 (1984) ("Although we have noted that retrospective civil legislation may offend due process if it is 'particularly "harsh and oppressive,"' that standard does not differ from the prohibition against arbitrary and irrational legislation that we clearly enunciated in Turner Elkhorn." (citation omitted) (quoting United States Trust Co. v. New Jersey, 431 U.S. 1, 17 n.13 (1977) (quoting Welch v. Henry, 305 U.S. 134, 147 (1938)))).

n190. 116 S. Ct. 1589 (1996).

n191. See id. at 1598.

n192. See id.

n193. Landgraf v. USI Film Prods., 511 U.S. 244, 272-73 (1994).

n194. See United States v. Carlton, 512 U.S. 26, 37-38 (1994) (O'Connor, J., concurring). In Blodgett v. Holden, 275 U.S. 142, 147 (1927), a plurality found application of the first federal gift tax to a transaction occurring before the legislation was proposed violative of the Due Process Clause. Later in Untermyer v. Anderson, 276 U.S. 440, 445-46 (1928), the Court again struck down application of the tax, although the transaction had occurred while the legislation was pending. See also Nichols v. Coolidge, 274 U.S. 531, 542-43 (1927) (striking down retroactive application of first federal estate tax).

n195. In 1935, the Court struck down a pension scheme which, inter alia, required railroads to pay pension benefits to all persons employed within one year of the statute, a category which included persons discharged for cause as well as those who retired or resigned to take other employment. The Court found such a category arbitrary and not tailored to Congress's intent to include persons on furlough or temporarily relieved of duty. See Railroad Retirement Bd. v. Alton R.R. Co., 295 U.S. 330, 349-54 (1935). In Pension Benefit the Court declined to overrule Alton "despite the changes in judicial review of economic legislation," Pension Benefit, 467 U.S. at 733, because the plan in Alton required further compensation for persons already fully compensated by the employer (not persons, as in Pension Benefit, whose rights had already vested in a pension plan), see id.

n196. See, e.g., Andrew C. Weiler, Has Due Process Struck Out? The Judicial Rubberstamping of Retroactive Economic Laws, 42 Duke L.J. 1069 (1993).

n197. See Bowen v. Georgetown, 488 U.S. 204, 223-24 (1988) (Scalia, J., concurring).

n198. See Graetz, supra note 175, at 1823 (describing grandfathering and similar provisions as typical in tax law).

n199. See Carlton, 512 U.S. at 38 (O'Connor, J., concurring) (collecting cases).

n200. See Krent, supra note 183, at 2174-79 (citing example of mining interests and mining legislation).

n201. See id. at 2179.

n202. See id.

n203. See Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 724 (1984).

n204. 126 Cong. Rec. 20,177, 20,179 (1980) (statement of Sen. Javits).

n205. See Long Island Oil Prods. Co. v. Local 553 Pension Fund, 775 F.2d 24 (2d Cir. 1985) (upholding legislation that reversed retroactive effects of prior law).

n206. See Usery v. Turner Elkhorn, 428 U.S. 1, 5 (1976).

n207. See General Motors v. Romein, 503 U.S. 181, 183 (1992); Pension Benefit, 467 U.S. at 725.

n208. See United States v. Sperry, 493 U.S. 52, 54-55 (1989).

n209. See United States v. Carlton, 512 U.S. 26, 28 (1994) (estate tax); United States v. Darusmont, 449 U.S. 292, 293 (1981) (alternative minimum tax).

n210. Such deliberateness can also be seen in more recent legislation regarding compensation for persons who have worked in the coal industry. In the Coal Industry Retiree Health Benefit Act of 1992, Pub. L. No. 102-486, 19143(a), 106 Stat. 3036, 3036-56 (codified as amended at 26 U.S.C. 9701-22 (1994)), Congress created a scheme for ensuring ongoing health care for coal miners. In rejecting due process challenges to this legislation, the courts have noted that Congress was concerned that the coal operators had created legitimate expectations of lifetime benefits, but had then circumvented their resulting obligations through contractual arrangements. Retroactivity of the new benefit scheme was therefore necessary to protect the legitimate expectations of the miners. See Davon, Inc. v. Shalala, 75 F.3d 1114, 1118 (7th Cir. 1996) (recounting developments in industry leading to Coal Commission's determination that retired miners were "entitled to health care benefits that were promised them"); LTV Steel Co. v. Shalala (In re Chateaugay Corp.), 53 F.3d 478, 483-86 (2d Cir. 1995) (describing crisis leading to legislation, Coal Commission's recommendation for retroactive financing scheme, and need for scheme to protect legitimate expectations fostered by coal operators).

n211. AEDPA 440(a) eliminated the INA's statutory provisions for review of final orders of deportation for aliens who committed any of the crimes that render an alien mandatorily deportable. See AEDPA, Pub. L. No. 104-132, 440(a), 110 Stat. 1214, 1276-77 (1996) (repealed by IIRIRA 1996). Also, AEDPA 401(e)

deleted the old INA 106(a)(10), 8 U.S.C. 1105a(a)(10) (1994), which, as an exception to the general rule granting exclusive jurisdiction in deportation matters to the United States Courts of Appeals, entitled aliens in detention pursuant to a deportation order to habeas corpus review in the district courts. See AEDPA 401(e), 110 Stat. at 1268 (repealed by IIRIRA 1996). IIRIRA 306(a)(2) eliminated INA 106, 8 U.S.C. 1105a, and amended INA 242(g), 8 U.S.C. 1252(g), to provide that, "except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act." See IIRIRA 306(a)(2), 1996 U.S.C.C.A.N. (110 Stat.) at 3009-612 (codified at 8 U.S.C. 1252(g) (Supp. II 1997)). By revising INA 242(a)(2)(C), IIRIRA 306(a)(2) maintained AEDPA's elimination of judicial review of deportation orders for certain criminal aliens, see IIRIRA 306(a)(2), 1996 U.S.C.C.A.N. (110 Stat.) 3009-546, 3009-607 to -608 (codified at INA 242(a)(2)(C), 8 U.S.C. 1252(a)(2)(C) (Supp. II 1996)), including those who become deportable under the newly expanded definition of "aggravated felony."

n212. See Respondents' Brief at 12-18, Henderson v. Reno (2d Cir. 1997) (Nos. 97-4050 & 97-4070) (on file with author); Appellees' Brief at 16-22, Goncalves v. INS (1st Cir. 1997) (No. 97-1953) (on file with author); see also supra note 17.

n213. See Benson, supra note 21, at 1484-94.

n214. This was not always the case. See Neuman, supra note 102, at 63-71.

n215. In the months preceding the enactment of AEDPA and IIRIRA, for example, Congress considered a number of laws that implicated a wide range of immigrant interests. See Immigration Control and Financial Responsibility Act of 1996, S. 1664, 104th Cong. (1996) (including provisions to improve verification systems for public benefits and employment, establish summary asylum procedures, and mandate deportation of certain aliens receiving public benefit, as well as, in its original form, reduce number of visas issued to legal immigrants); Immigration in the National Interest Act of 1995, H.R. 2202, 104th Cong. (1995) (including provisions to change legal immigration system, cap number of refugees, establish summary asylum proceedings, and make sponsors of legal immigrants strictly liable for any public benefits a sponsored immigrant might receive); see also Message from the President of the United States Transmitting a Draft of Proposed Legislation Entitled, "Immigration Enforcement Improvements Act of 1995," H.R. Doc. No. 104-68 (1995) (detailing Clinton Administration's proposed legislation for altering immigration law enforcement). Many of the issues addressed in these bills came out of the U.S. Commission on Immigration Reform (the Barbara Jordan Commission), which issued the following two reports: U.S. Immigration Policy: Restoring Credibility (1994) and Legal Immigration: Setting Priorities (1995). In addition, there were numerous hearings on issues of interest to immigrant advocates. See Verification of Eligibility for Employment and Benefits: Hearing before the Subcomm. on Immigration and Claims of the House Comm. on the Judiciary, 104th Cong. (1995) (employment verification and its discriminatory impact on documented aliens); Worksite Enforcement of Employer Sanctions: Hearing before the Subcomm. on Immigration and Claims of the House Comm. on the Judiciary, 104th Cong. (1995) (same); Impact of Illegal Immigration on Public Benefit Programs and the American Labor Force: Hearing

before the Subcomm. on Immigration and Claims of the House Comm. of the
Judiciary, 104th Cong. (1995) (economic impact of immigration); The Impact of
Federal Immigration Policy and INS Activities on Communities: Hearings before
the Subcomm. on Information, Justice, Transportation, and Agriculture of the
House Comm. on Government Operations, 103d Cong. (1993, 1994) (same); Concurrent
Resolution on the Budget for Fiscal Year 1997: Hearings before the Senate Comm.
on the Budget, 104th Cong. (1996) (enforceability of sponsor affidavits).
Immigrant advocates were also busy with proposals to deny federal and state
need-based benefits to permanent residents and to prohibit states from supplying
aid to undocumented immigrants. Many of these provisions were enacted by the
Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L.
No. 104-193, 1996 U.S.C.C.A.N. (110 Stat.) 2105, 2260-2275 (codified as amended
in scattered sections of 8, 42 U.S.C.).

    n216.  The task of these groups was particularly problematic given the
sweeping changes in the immigration laws that Congress considered over the past
two years. One of the Senators who was most active in protecting immigrant
rights was also the most outspoken in putting through restrictive provisions
affecting immigrants with criminal convictions. See Eric Schmitt, Playing by
Senate Rules Wins the Day, N.Y. Times, Mar. 3, 1996, 1, at 24 (describing
efforts by Senator Abraham to remove provisions concerning quotas on legal
immigration from immigration legislation); Lisa Zagaroli, Senators Use Rank to
Set Pet Priorities: Achievements of Immigrants Get Hearing From Senator Abraham,
Detroit News, Mar. 23, 1997, at B5 (quoting Senator Abraham as saying, "You
don't shut down the borders. What you do is you say we're going to apply the
criminal laws more harshly.").

    n217. See Plyler v. Doe, 457 U.S. 202 (1982) (invalidating Texas denial of
state funds for schooling of undocumented alien children); Sugarman v. Dougall,
413 U.S. 634 (1973) (invalidating bar to employment of noncitizens in
competitive state civil service); Graham v. Richardson, 403 U.S. 365 (1971)
(using strict scrutiny to strike down state welfare laws discriminating against
aliens); Takahashi v. Fish & Game Comm'n, 334 U.S. 410 (1948) (striking down ban
on issuance of commercial fishing licenses to noncitizens); Oyama v. California,
332 U.S. 633 (1948) (striking down state's Alien Land Law which forbade aliens
ineligible for citizenship, i.e., Asians, from owning or transferring land);
Yick Wo v. Hopkins, 118 U.S. 356 (1886) (striking down law used by municipal
authorities to deny Chinese immigrants permission to conduct laundry business).
But cf. Foley v. Connelie, 435 U.S. 291 (1978) (upholding state law barring
noncitizens from certain police jobs and limiting strict scrutiny to statutes
affecting aliens' right to exist in community).

    n218. See United States v. Carlton, 512 U.S. 26, 37-38 (1994) (O'Connor, J.,
concurring).

    n219. See supra notes 76-96 and accompanying text. Legislation designed to
spread the costs of health care has also tended to have a longer retroactive
reach. See, e.g., Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 14-15 (1976)
(statute provided for liability to former employees). In these settings,
however, the level of retroactivity is related to the core congressional purpose
of cost-sharing among those fairly responsible for a problem. Longer
retrospective reach may be necessary to include those employers who share
responsibility for the problem, where a far greater burden might otherwise be

borne by a smaller group of existing employers. But, at the very least, courts have insisted that the degree of retroactive reach be supported by a legitimate rationale. See, e.g., LTV Steel Co. v. Shalala (In re Chateaugay Corp.), 53 F.3d 478, 491 (2d Cir. 1995) (finding that degree of retrospective reach of Coal Industry Retiree Benefit Act of 1992 was "commensurate with [company's] share of responsibility for the coal miner retiree health benefit crisis").

n220. See Trop v. Dulles, 356 U.S. 86, 98 (1958) (recognizing that "deportation is undoubtedly a harsh sanction that has a severe penal effect"); Fong Haw Tan v. Phelan, 333 U.S. 6, 10 (1948) (stating that "deportation is a drastic measure and at times the equivalent of banishment or exile").

n221. See supra note 130.

n222. See, e.g., Galvan v. Press, 347 U.S. 522, 531 (1954); Bugajewitz v. Adams, 228 U.S. 585, 591 (1913).

n223. The courts' role in protecting unpopular groups from arbitrary legislation is well recognized in the equal protection context. Even in cases where the Court is applying the rational basis test, it has rejected arbitrary legislative rationales that are rooted in animosity towards such groups. See, e.g., Romer v. Evans, 517 U.S. 620 (1996) (striking down law discriminating against homosexuals); City of Cleburne v. Cleburne Living Center, 473 U.S. 432 (1985) (striking down law discriminating against mentally retarded).

n224. Stephen Munzer argues that retroactive statutes "carry some special burden of justification, particularly when personal liberties are at stake." Munzer, supra note 175, at 438. By wresting a person from family, friends, and employment, deportation surely implicates liberty, whether or not it is imposed as "punishment."

n225. United States v. Carlton, 512 U.S. 26, 37-38 (1994) (O'Connor, J., concurring).

n226. Ng Fung Ho v. White, 259 U.S. 276, 284 (1922).

n227. See Aleinikoff, supra note 43, at 25-27.

n228. See supra notes 75-80 and accompanying text.

n229. See AEDPA, Pub. L. No. 104-132, 440(d), 110 Stat. 1214, 1277 (1996) (repealed by IIRIRA 1996); see also supra note 74.

n230. See IIRIRA 304(b), 1996 U.S.C.C.A.N. (110 Stat.) 3009-546, 3009-597 (repealing INA 212(c), 8 U.S.C. 1182(c) (1994)). IIRIRA retains the bar for those drug convictions treated as aggravated felonies. Although the terminology of the aggravated felony provision, see 8 U.S.C. 1101(43)(B) (Supp. II 1996), appears to include only trafficking crimes, the interrelationship of state and federal definitions can mean that some possession convictions would serve as aggravated felonies. See infra note 263.

n231. See supra note 75.

n232. See Yesil v. Reno, 973 F. Supp. 342, 379-83 (S.D.N.Y. 1997); Mojica v. Reno, 970 F. Supp. 130, 172-74 (E.D.N.Y. 1997). But see Vargas v. Reno, 966 F. Supp. 1537, 1544 (S.D. Cal. 1997) (concluding that AEDPA's bars to relief did not have "retroactive effect" upon plaintiff previously convicted for possession

of marijuana). In Yesil and Mojica, the district courts found that they had habeas jurisdiction to hear the statutory claims. Both courts found that AEDPA's other retroactive provisions created a negative implication that the bars to relief under section 440(d) were not meant to be retroactive. See Yesil, 973 F. Supp. at 379-80; Mojica, 970 F. Supp. at 172-73. In Yesil, the court further found that this reading was supported by the legislative history of AEDPA, which showed that explicit retroactivity provisions had been removed in the final version of the bill. See Yesil, 973 F. Supp. at 380-81. In addition, both courts found that, in light of the presumption against reading statutes retroactively and the absence of clear congressional intent to make bars to relief retroactive, those bars should not be given retroactive effect. See Yesil, 973 F. Supp. at 379-83; Mojica, 970 F. Supp. at 172-82.

n233. Under ordinary rational basis review, the Court often has stated that a legitimate purpose for a statute need not be evident in the statute's legislative history. See, e.g., United States R.R. Retirement Bd. v. Fritz, 449 U.S. 166, 179 (1980) (the Court itself finding "plausible" justification for legislative scheme in order to satisfy rationality standard of equal protection challenge because it is "'constitutionally irrelevant whether this reasoning in fact underlay the legislative decision'" (quoting Flemming v. Nestor, 363 U.S. 603, 612 (1960))). But at the same time, it has stricken discriminatory practices where the Court was called upon to search for a legislative purpose and there was no indication that the responsible policy actors intended to cause the discriminatory state practice. See Allegheny Pittsburgh Coal Co. v. County Comm'n, 488 U.S. 336 (1989).

n234. See, e.g., Hughes Aircraft Co. v. United States, 117 S. Ct. 1871, 1876 (1997); Landgraf v. USI Film Prods., 511 U.S. 244, 269 (1994).

n235. Landgraf, 511 U.S. at 268.

n236. See Mojica, 970 F. Supp. 130.

n237. See id. at 177-80.

n238. See id. at 179.

n239. It is possible that some immigrants committed their crimes and were convicted after April, 1996, and entered deportation proceedings before April, 1997. For these people, the AEDPA bars would be prospective. But the timing of commencement of proceedings means that the vast majority of cases affected by the AEDPA bar to relief would be ones in which the person would have been convicted of his or her crime before the new rules went into effect.

n240. Of course, the fact that some people are made better off by a subsequent statutory scheme is not ordinarily cause for finding distinctions irrational as a matter of equal protection analysis. But given the Attorney General's concession that AEDPA's bars on relief are at best ambiguous, see Op. Att'y Gen., In re Soriano, 1996 WL 426888, at *38, *41 (Feb. 21, 1997) (asserting that Congress did not speak to retroactivity of AEDPA's bar to relief from deportation), the question becomes whether it is a rational reading of the congressional scheme to impose bars to relief that operate on a one-time-only basis and operate primarily as retroactive restrictions.

n241. See supra note 87 (discussing statutory arguments for limiting new rule that clock stops with commission of crime to crimes committed after effective date of IIRIRA).

n242. Under IIRIRA, section 212(c) relief has been replaced by "cancellation of removal." See IIRIRA, Pub. L. No. 104-208, 304(a)(3), 1996 U.S.C.C.A.N. (110 Stat.) 3009-546, 3009-594 (codified at 8 U.S.C. 1229b (Supp. II 1996)). The interim regulations implementing IIRIRA reserved 8 C.F.R. 240.21-.24 for provisions on cancellation of removal. See 62 Fed. Reg. 10,312, 10,367 (Mar. 6, 1997). 8 C.F.R. 240.21 has since been devoted to issues regarding conditional grants of suspension and cancellation of removal for nonpermanent residents. See 62 Fed. Reg. 51,762 (Oct. 3, 1997). No regulations have been published that speak directly to the issue of retroactivity.

n243. The only reference to cancellation of removal in the new regulations implementing IIRIRA is in a section on procedures for reopening cases. These regulations require that a permanent resident moving to reopen proceedings show that she or he meets the eligibility requirements of the new clock-stopping provisions. The regulations merely repeat the text of the new statutory rule without addressing the possibility that the rule does not apply if the offense was committed prior to the general effective date of IIRIRA. See 8 C.F.R. 3.23(b)(3), as amended, 62 Fed. Reg. 10,312, 10,333 (Mar. 6, 1997).

n244. See Removal of Criminal and Illegal Aliens, 1995: Hearing Before the Subcomm. on Immigration and Claims of the House Comm. on the Judiciary, 104th Cong. 1 (1995) (statement of Rep. Lamar Smith); H.R. Rep. No. 104-469, pt. 1 (1996) (discussing background and need for the legislation); 141 Cong. Rec. S7822 (daily ed. June 7, 1995) (statement of Sen. Abraham).

n245. See Removal of Criminal and Illegal Aliens, 1995: Hearing Before the Subcomm. on Immigration and Claims of the House Comm. on the Judiciary, 104th Cong. 2 (1995) (statement of Rep. Lamar Smith).

n246. See 142 Cong. Rec. S4599 (daily ed. May 2, 1996) (statement of Sen. Abraham).

n247. In the House version of the bill that eventually became IIRIRA, continuous residency for the purpose of determining eligibility for cancellation of removal would terminate when the INS issued a notice to appear for removal proceedings. See H.R. 2202, 104th Cong. 240A(d)(1) (1996) (printed in H.R. Rep. No. 469, pt. 1, at 24 (1996)). The Senate's version tolled residency at the issuance of an order to show cause. See S. 1664, 104th Cong. 244(a)(2)(A) (1996) (printed in S. Rep. No. 249, at 125-26 (1996)).

n248. See H.R. 2202, 104th Cong. 309(c)(5), at 169 (1996).

n249. See H.R. Conf. Rep. No. 104-828, at 213 (1996) (referring to changes to INA 240A, the report states that "Senate amendment Section 150 recedes to these House provisions, with modifications"); cf. id. at 224 (describing changes to the definition of "conviction" that specify the legislation's purpose of broadening the scope of a specific BIA decision).

n250. See id. at 50 (discussing statutory arguments for limiting the scope of section 240A(d)).

60

n251. See H.R. Conf. Rep. No. 104-828, at 214 (describing, but not explaining, change in INA 240A(d)).

n252. See supra note 87 for statutory arguments to limit the clock-stopping rule to prospective application.

n253. See supra text accompanying notes 233-35.

n254. See supra note 75.

n255. See Welch v. Henry, 305 U.S. 134, 147 (1938); see also supra notes 187-92 and accompanying text.

n256. See supra notes 65-68 and accompanying text.

n257. See Harisiades v. Shaughnessy, 342 U.S. 580, 593 (1952). The statute at issue in Harisiades made noncitizens deportable for any past membership in the Communist Party. As the Court explained in Harisiades, prior law had made noncitizens deportable for membership in any organization that advocated the overthrow of the United States government, a category that included the Communist Party. The Court concluded that "there can be no contention that [these noncitizens] were not adequately forewarned both that their conduct was prohibited and of its consequences." Id. at 593.

n258. See id. at 590-91. The Court also suggested that Congress had no option but to pass a law that applied to past members of the Communist Party, because the Party had expelled its alien members. See id. at 593 (implying that new legislation authorizing deportation of persons who had been but were no longer Communist Party members was justified as response to Court's holding in Kessler v. Strecker, 307 U.S. 22, 29-30 (1939), that only current members were within scope of legislation).

n259. Previous amendments to the INA definition of aggravated felony applied only to convictions entered "on or after the date" of the enactment. See AEDPA, Pub. L. No. 104-132, 440(f), 110 Stat. 1214, 1278 (1996) (codified at 8 U.S.C. 1101 note (Supp. II 1996)); Immigration and Nationality Technical Corrections Act of 1994, Pub. L. No. 103-416, 222(b), 108 Stat. 4305, 4322 (codified at 8 U.S.C. 1101 note (1994)); Immigration Act of 1990, Pub. L. No. 101-649, 501(b), 104 Stat. 4978, 5048 (codified at 8 U.S.C 1101 note (1994)).

n260. In addition, IIRIRA eliminated all prior prospectivity provisions. IIRIRA amended the INA to provide that "notwithstanding any other provision of law (including any effective date), the [new definition of aggravated felony] applies regardless of whether the conviction was entered before, on, or after September 30, 1996." INA 101(a)(43), 8 U.S.C. 1101(a)(43) (Supp. II 1996) (enacted by IIRIRA, Pub. L. No. 104-208, 321(b), 1996 U.S.C.C.A.N. (110 Stat.) 3009-546, 3009-628).

n261. In addition, a permanent resident convicted of an "aggravated felony" who leaves the United States under an order of removal is permanently barred from admission to the country. See INA 212(a)(9)(A), 8 U.S.C. 182(a)(9)(A) (Supp. II 1996). IIRIRA did not, however, change the rule that the conviction must be after 1988 for a person to be deportable by reason of being an aggravated felon. Nevertheless, most aggravated felons are subject to

deportation on other grounds, and then subject to IIRIRA's bar on relief for aggravated felons. See supra note 48.

n262. See S. 1664, 104th Cong. 101(a)(43), 244(a)(1)(A), 244(a)(2)(E) (1996) (printed in S. Rep. No. 104-249, at 88-90, 125-26 (1996)).

n263. It is settled that the aggravated felony definition includes some drug crimes that are punished as misdemeanors under state law. In several cases, the BIA has ruled that regardless of whether a state treats a drug crime as a misdemeanor, it will be treated as an "aggravated felony" for immigration purposes if it is analogous to a federal felony under the federal statutes enumerated in the aggravated felony definition, or if it is punished as a felony under state law and has a nexus to drug trafficking. See In re L-G-, No. 3254, 1995 WL 582051 (B.I.A. Sept. 27, 1995) (interim decision); In re Davis, 20 I. & N. Dec. 536 (B.I.A. 1992). This interpretation has important consequences for the sweep of the aggravated felony bar. By analogy to the federal criminal law, any drug sale conviction or any second possession charge is classified as an "aggravated felony." See 8 U.S.C. 1101(43)(B) (1994) (incorporating definitions in 18 U.S.C. 924(c)(2)). In New York, sale of marijuana in the fourth degree is punished as a class A misdemeanor. See N.Y. Penal Law 221.40 (McKinney 1989). Many drug possession charges are also classified as misdemeanors. See, e.g., N.Y. Penal Law 221.15 (McKinney 1989 & Supp. 1997-98) (classifying criminal possession of marijuana in fourth degree as class A misdemeanor); N.Y. Penal Law 220.03 (McKinney 1989) (classifying criminal possession of controlled substance in seventh degree as class A misdemeanor). Two such misdemeanor convictions constitute an aggravated felony under federal immigration law.

Unlike the aggravated felony definition for drug offenses, which refers to specific sections of the federal code that can serve as a benchmark for what constitutes a felony, some of the new aggravated felony definitions have no such reference. There is therefore a question whether state misdemeanor convictions in non-drug cases should be treated as meeting the federal definition of an aggravated felony. For example, under IIRIRA, a crime of sexual abuse of a minor is an aggravated felony. See 8 U.S.C. 1101(43)(A) (Supp. II 1996). In New York, sexual abuse in the third degree, which includes crimes committed against minors, is a class B misdemeanor. See N.Y. Penal Law 130.55 (McKinney 1987). The federal law further defines all theft crimes carrying a term of imprisonment of one year as aggravated felonies. See 8 U.S.C. 1101(43)(G) (Supp. II 1996). In New York, petit larceny is a misdemeanor that can lead to a sentence of one year. See N.Y. Penal Law 155.25 (McKinney 1988).

With respect to drug charges, the language of the federal definition, which refers to specific sections of the federal code, leaves little room for interpretation. But for some of the new aggravated felony categories, such as sexual abuse of a minor, it is possible that the agency will interpret the new definitions so as not to include crimes punished as misdemeanors under state law. Of course, the government would probably argue that any contrary interpretation would not be reviewable by any court.

n264. See, e.g., 142 Cong. Rec. S4598 (daily ed. May 2, 1996) (statement of Sen. Abraham) (stating, in reference to problem of criminal aliens who are deportable and should be deported, "These are not suspected criminals: These are convicted felons."). The broad scope of the new law, and its harshness as

62

applied retroactively, appears to have come as a surprise to one of the most ardent supporters of the legislation. Discussing the case of Jesus Collado, see supra text accompanying notes 81-88, Senator Abraham accused the INS of failing to establish its priorities properly and of otherwise misunderstanding the new law. See Mirta Ojito, U.S. Frees Immigrant Jailed for 1974 Misdemeanor, N.Y. Times, Oct. 25, 1997, at B1. It is difficult to see, however, what discretion is left under the new law. Under IIRIRA, a permanent resident, like Jesus Collado, who traveled outside the country, is "inadmissible" if she or he falls under the grounds of criminal inadmissibility and therefore must be placed in removal proceedings. See INA 212(a)(2), 8 U.S.C. 1182(a)(2) (Supp. II 1996). Once a permanent resident is placed in removal proceedings, IIRIRA prevents the exercise of discretion. It eliminates the discretion to recognize that some "aggravated felonies" are not as serious as the label makes them sound, or that the circumstances of the person's case, such as Jesus Collado's subsequent 23 years of a crime-free life, have any bearing on the requirement of deportation. Jesus Collado has been freed from detention, but as the news reports and the terms of the new statute make clear, he is still very much at risk of being deported.

n265. See 8 U.S.C. 1227(a)(2)(B)(i) (Supp. II 1996).

n266. 341 U.S. 223 (1951).

n267. See supra notes 141-51 and accompanying text.

n268. See supra text accompanying notes 60-62.

n269. Cf. Usery v. Turner Elkhorn, 428 U.S. 1, 17 (1976) (holding that retroactive application must account for employers with no knowledge of dangers of black lung).

n270. See 142 Cong. Rec. S12,295 (daily ed. Sept. 30, 1996); see also Removal of Criminal and Illegal Aliens: Hearing Before the Subcomm. on Immigration and Claims of the House Comm. on the Judiciary, 104th Cong. 3 (1996) (statement of Rep. Lamar Smith) ("Based on... recent Board of Immigration Appeals decisions, there is legitimate concern that even a narrowly tailored form of relief would soon be broadened to include a wide range of cases never intended by Congress.").

n271. The basic law regarding standards for section 212(c) relief from deportation has remained unchanged since In re Marin, 16 I. & N. Dec. 581 (B.I.A. 1978).

n272. See, e.g., United States v. Carlton, 512 U.S. 26, 31-32 (1994) (noting unexpected revenue losses from mistake in tax provision); General Motors Corp. v. Romein, 503 U.S. 181, 185 (1992) (describing unforeseen judicial interpretation of workers' compensation benefits statute).

n273. See Carlton, 512 U.S. at 37-38 (O'Connor, J., concurring). Arguably, permanent residents can achieve repose by becoming citizens. Under the new laws, this may be a valid argument for expecting permanent residents to become citizens. Both the provisions on permanent residents accused of crimes and the new laws on benefits have given permanent residents reason to fear for the stability of their position and, not surprisingly, have led to a vast increase in applications for citizenship. But in earlier years, permanent residents had

63

good cause to see their position in this country as fairly secure. Despite Supreme Court decisions declaring the tenuous nature of their status, see supra notes 108-29 and accompanying text, the day-to-day reality of life for permanent residents was that they had most of the privileges of citizenship. These immigrants can hardly be faulted for not being aware of the instances in our history where the fundamental norms against retroactive application of statutes were cast aside to support the retroactive deportation of long term permanent residents. For an interesting discussion of the divergence between popular conceptions of fairness and the immigration laws, see Weisselberg, supra note 110, at 1004-11.

n274. See 142 Cong. Rec. H11,085 (daily ed. Sept. 25, 1996) (statement of Rep. Gilman) ("We have a strong obligation in protecting our citizens from illegal criminal aliens, who prey on them with drugs, and other crime-related activity."); 142 Cong. Rec. S3328 (daily ed. Apr. 15, 1996) (statement of Sen. Abraham) ("Many of these noncitizen lawbreakers end up back on our streets to prey on law-abiding American citizens.").

n275. Two courts have treated substantive due process review of deportation statutes as requiring no more than a cursory analysis. See Hamama v. INS, 78 F.3d 233, 236 (6th Cir. 1996) (assuming that interest in protecting society from illegal use of dangerous weapons would extend to any past use of such weapons); United States v. Yacoubian, 24 F.3d 1, 7-8 (9th Cir. 1994) (assuming that treatment of current and past offenses equally meets Pension Benefit test, even though adoption of such standard obliterates separate justification requirement of Pension Benefit itself).

n276. 305 U.S. 134, 147 (1938).

n277. See Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 733 (1984) (applying rational review test).

n278. The very first glimmers of the possibility for political action appeared after this Article was written. A year after the passage of IIRIRA and a year-and-a-half after AEDPA's enactment, Senator Abraham's staff indicated an interest in modifying the law to the extent that INS saw itself as having no discretion whether to place persons with old convictions into proceedings. See Mirta Ojito, Old Crime Returns to Haunt an Immigrant, N.Y. Times, Oct. 15, 1997, at B1. This glimmer of hope is far too late for the permanent residents who already have been deported under the new laws, and offers little hope of restoration of the preexisting right to apply for relief and have that application considered by a judicial officer. But most disturbingly, such after-the-fact consideration of the consequences of retroactivity turns retroactivity jurisprudence on its head. The purpose of judicial scrutiny of retroactivity is to ensure that Congress carefully considers the implications of retroactivity before, not after, the retroactive laws work their harsh effects.

n279. See Krent, supra note 183, at 2168-73.

64